UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMON NGUYEN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>SIMPSON STRONG-TIE COMPANY, INC., et al.,<br><br>    Defendants. | Case No. 19-cv-07901-TSH<br><br>**ORDER RE MOTION TO STRIKE PORTIONS OF THE SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 80 |

## I.   INTRODUCTION

Plaintiffs brought this putative class action alleging that Defendants' metal hurricane straps, which are installed in or on their homes, prematurely corrode and fail, rendering them incapable of protecting Plaintiffs' homes. Plaintiffs filed their Second Amended Class Action Complaint ("SAC") on June 16, 2020. ECF No. 66. Defendants have moved to strike as immaterial or improper a number of allegations in the SAC. ECF No. 80. Plaintiffs have filed an Opposition to the motion, ECF No. 85, and Defendants a Reply, ECF No. 89. The Court finds this matter suitable for disposition without oral argument. *See* N.D. Cal. Civil L.R. 7-1(b). For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part the Motion to Strike.

## II.   BACKGROUND

In brief, Plaintiffs allege that Defendants Simpson Strong-Tie Company, Inc. and Simpson Manufacturing Co., Inc. (jointly "Simpson") developed, manufactured, advertised, sold, and distributed galvanized metal hurricane straps (the "Products") for embedment at concrete foundations edges in buildings and homes throughout the United States. SAC ¶ 1. Some of these straps are installed in Plaintiffs' homes. Plaintiffs allege that the Products "have inherent defects that are substantially certain to result in failures during the Products' useful life." *Id.* ¶¶ 21, 28,

35, 42, 49, 55.  They allege that Simpson has actively concealed the defects from consumers.  *Id.* ¶ 22, 29, 36, 43, 50, 56.  They assert violations of the California Consumers Legal Remedies Act, California Unfair Competition Law, and the Arizona Consumer Fraud Act, as well as claims for breach of express warranty, negligent misrepresentation, and fraud.

Simpson seeks to strike from the SAC various allegations on the grounds that the allegations either: describe settlements in prior litigation despite Federal Rule of Evidence ("FRE") 408's prohibitions on the use of prior settlements as evidence; reference changes Simpson made in its literature in violation of Federal Rule of Evidence 407's prohibition on the use of evidence of subsequent remedial measures; or cite to a previously-filed expert declaration despite the fact that Federal Rule of Civil Procedure 10(c) and related caselaw preclude citations to expert declarations in a complaint.  Simpson seeks an order striking these allegations or references as immaterial or improper pursuant to Federal Rule of Civil Procedure 12(f).

### III.   LEGAL STANDARDS

Rule 12(f) provides that either on a motion or on its own, a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded," and "'[i]mpertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question.'" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (citations and internal quotation marks omitted), *rev'd on other grounds by* 510 U.S. 517 (1994).

Pursuant to Rule 12(f) Courts have struck from pleadings information that is privileged or inadmissible under the Federal Rules of Evidence.  *See, e.g.*, *Hensley v. City of Port Hueneme*, No. 2018 WL 5903963, at *3 (C.D. Cal. Mar. 21, 2018) (striking from a complaint portions that were subject to attorney-client privilege); *Riley v. City of Richmond*, 2014 WL 5073804, at *7 (N.D. Cal. Oct. 9, 2014) (striking references to parties having settled prior action because they were "immaterial, as evidence to support them would be inadmissible under Rule 408 of the Federal Rules of [Evidence]"); *Philadelphia's Church of Our Savior v. Concord Township*, 2004 WL 1824356, at *2 (E.D. Pa. July 27, 2004) ("While Rule 408 does not apply to pleadings directly,

1  repeated decisions from this Court have held that allegations in a complaint may be stricken, under

2  Rule 12(f), as violative of these policies.") (citations omitted).  Courts also have used their

3  inherent power to strike "inappropriate materials such as confidential mediation and settlement

4  information that are improperly part of the public record." *See, e.g.*, *Jones v. Metro. Life Ins. Co.*,

5  2010 WL 4055928, at *6 (N.D. Cal. Oct. 15, 2010); *id.* at *14 ("[U]nder its inherent powers this

6  Court may strike a paragraph from a case management document that discloses confidential

7  settlement negotiations . . . .  [Plaintiff's] reference to settlement negotiations in [that document]

8  would be inadmissible under Federal Rules of Evidence 401, 403, and 408" and thus "should be

9  stricken.").

## IV.   ANALYSIS

### A.   References to Settlements in Prior Cases

Simpson argues that references in the SAC to settlements in two prior lawsuits violate FRE 408 and should be stricken on that basis.  Simpson argues that because these references would be inadmissible under Rule 408, they are immaterial and impertinent.[1]  The relevant allegations are found in paragraphs 127 and 129:

> ¶ 127: In 2009, homeowners in the Ocean Pointe development in Hawaii filed class action lawsuits against, among other defendants, Simpson.  The Ocean Pointe developer used tens of thousands of the same defective HD Strap-Tie Holdowns and MAS Mudsill Anchors at issue here in thousands of Ocean Pointe homes since at least 1999.  The Ocean Pointe lawsuits concerned the same defects, same mechanism of failure, and same kinds of failures in Simpson HD Strap-Tie Holdowns and MAS Mudsill Anchors at issue here.  Simpson vigorously participated in the Ocean Pointe litigation, attending inspections and enlisting experts to analyze the HD Strap-Tie Holdown and MAS Mudsill Anchor corrosion and failures.  *Ultimately, the Ocean Pointe case resolved for tens of millions of dollars, most of which funded a repair program to install new anchor bolt holdown systems to replace tens of thousands of defective and corroding HD Strap-Tie Holdowns and MAS Mudsill Anchors*

---

[1] Simpson had also argued that Plaintiffs' settlements allegations violated the confidentiality terms of one of the settlements in those cases and thus should be stricken on that ground also.  Mot. at 5-6.  After Plaintiffs challenged that assertion as inaccurate, Opp'n at 1, 3-5, Simpson admitted that it had "made an error and Plaintiffs are correct that the settlement agreement that resolved the Ocean Pointe litigation in Hawai'i was not confidential," Reply at 2.  Accordingly, the Court will not consider this argument.  The Court does not find that Simpson's statements regarding the confidentiality of the settlement were made with the intent to mislead the court, but rather were made out of error.  *See* Decl. of Erick C. Howard ISO Reply, ECF No. 90.

> *embedded in 1,628 Ocean Pointe homes.* Simpson representatives were aware of and monitoring the HD Strap-Tie Holdown and MAS Mudsill Anchor failures in Ocean Pointe years before those homeowners filed their class actions in 2009.
>
> ¶ 129: In 2011, homeowners in the Ewa by Gentry development in Hawaii filed a class action lawsuit against, among other defendants, Simpson. The Ewa by Gentry developer also used tens of thousands of the same defective HD Strap-Tie Holdowns and MAS Mudsill Anchors at issue here in thousands of Ewa by Gentry homes since at least 2001. The Ewa by Gentry lawsuit concerned the same defects, same mechanism of failure, and same kinds of failures in Simpson HD Strap-Tie Holdowns and MAS Mudsill Anchors at issue here. Simpson vigorously participated in the litigation, attending inspections and analyzing the HD Strap-Tie Holdown and MAS Mudsill Anchor corrosion and failures. *Ultimately, the Ewa by Gentry case resolved for tens of millions of dollars, most of which funded a repair program to install new anchor bolt holdown systems to replace tens of thousands of defective and corroding HD Strap-Tie Holdowns and MAS Mudsill Anchors embedded in 2,136 Ewa by Gentry homes.* Simpson representatives were aware of and monitoring the HD Strap-Tie Holdown and MAS Mudsill Anchor failures in Ewa by Gentry years before those homeowners filed their class action in 2011[.] On March 7, 2011, Simpson published that it had "become aware of problems regarding concrete spalling and corrosion of embedded products around the perimeter of some homes in Oahu, Hawai'i." Exhibit 5, March 7, 2011 Simpson Memorandum re Concrete Embedded Products in Hawai'i. Plaintiffs do not know exactly to whom this information was addressed and the extent to which it was disseminated. However, at some point after the March 7, 2011 Memorandum was published, Simpson placed a near identical warning on its website which was still found on the website. . . .

(emphasis added). Plaintiffs' sole argument vis-à-vis the allegations in these paragraphs is that they are necessary for Plaintiffs to plead Simpson's knowledge of the specific defect in the embedded Products. *See* Opp'n at 5-8. Plaintiffs note that FRE 408(b) provides that courts may admit settlement evidence for purposes other than to prove or disprove the validity of a claim, including "to show Simpson's state of mind, prior knowledge, fraud, and intent, all of which are required for the claims here." *Id.* at 6 (citing *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1363 (10th Cir. 1987); *C & E Servs., Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 320-21 (D.D.C. 2008); *Green v. Baca*, 226 F.R.D. 624, 641-642 (C.D. Cal. 2005)). They argue that "Simpson's knowledge of [product] failures that it gained . . . out of litigation in those two cases and from the repairs on more than 3,500 homes with the Products that were funded by settlements is certainly material and pertinent to the class claims here, satisfying the pleading requirements to establish Simpson's prior knowledge of defects required for each of these claims." But Simpson is not

4

seeking to strike the entirety of paragraphs 127 and 129, only "the two references to a purported settlement, not the other allegations regarding the Hawai'i class actions." Reply at 3. Plaintiffs for their part concede that Simpson was "not even a party to [the] settlement[s]," and that "[t]he SAC does not allege that *Simpson* settled any cases at all." Opp'n at 5-6 (emphasis added). They concede also that "the SAC alleged neither that Simpson paid money into the Ocean Pointe Settlement nor [any other] amount that Simpson paid . . . ." *Id.* at 4.[2] Therefore, the allegations regarding the purported settlements have nothing to do with Simpson's "state of mind, prior knowledge, fraud, and intent," let alone involve Simpson. In other words, Plaintiffs' references to purported settlements have "no possible bearing upon the subject matter of the litigation." *Wailua Assocs. v. Aetna Cas. & Sur. Co.*, 183 F.R.D. 550, 554 (D. Haw. 1998) (citation and internal quotation marks omitted). Whether or not Plaintiffs included the settlement allegations in an attempt to mislead (Simpson argues that they did), they are impertinent and immaterial and inappropriate[3], and the Court will strike them.

## B.     Allegations Regarding Changes to Corrosion Warnings

Simpson next challenges several allegations in the SAC relating to changes in Simpson's definition of "Interior Dry Service." These allegations include the following:

> After years of marketing the sufficiency of G90 galvanization for . . . the Interior Dry Service Environment Simpson [sic] consistently defined [sic] through 2018[,] <u>as a direct result of the Products' failures in thousands of homes, Simpson materially changed its Interior Dry Service definition in the 2019-2020</u> to [sic] provide for the first time that (1) "dry-service environment may contain *airborne* salts;" and (2) "Exposure Condition 2 reflects the presence of *airborne* salt in a dry-service environment and corrosion hazard to exposed metal surfaces. . . . None of Simpson's prior definitions for Interior Dry Service ever warned that its Interior Dry Service environment could contain *any* salt, nor did any of Simpson's Interior Dry Service definitions advise construction professionals to evaluate that

---

[2] In their Opposition, Plaintiffs reference a portion of one of the two settlement agreements and included therein an apparent payment made by "Simpson's Insurers." Opp'n at 4-5. But Plaintiffs make no allegation in the SAC concerning whatever payment that was or who made it or for what reason it was made, so the reference doesn't change the Court's analysis. Furthermore, even if the SAC did contain those allegations, *that* type of evidence would likely be the type excluded by FRE 408.

[3] Once you peel away Plaintiffs' argument that the allegations in the paragraphs as a whole go to Simpson's knowledge, there's no argument left for why the *settlement* allegations are material or pertinent—i.e., for why they are in the complaint.

possibility.

SAC ¶ 134 (underlining added); *see also, id.* ¶ 135 ("Although Simpson's 2019-2020 catalog has belatedly acknowledged and warned that its Interior Dry Service environment could still contain airborne salt . . . ."), ¶ 161 ("Simpson modified the Interior Dry Service definition in the new 2019-2020 definition when it for the first time indicated that atmospheric salt could be present in an Interior Dry Service environment. However, this modification was still not enough . . . .").

Simpson argues that these allegations are impermissible because they relate to subsequent remedial measures. Under Federal Rule of Evidence 407, "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." FRE 407. Simpson argues that Plaintiffs' only purpose for including these allegations "is to prove that there was a need to change the definition," i.e., a defect in its products, "and that Simpson is culpable for its prior recommendations regarding 'Interior Dry Service.'" Mot. at 7.

Plaintiffs counter that these allegations are not remedial at all, "that all of Simpson's specifications and statements, including its 2018-20 specifications and statements, are inadequate and integral to its ongoing concealment of known defects in the embedded Products in a so-called Interior Dry Service environment." Opp'n at 8. They contend that "Simpson's 2018-20 inadequate specifications and warnings apply to claims for and defenses against class members who own the Products purchased during that period." *Id.* Thus, they argue, Rule 407 doesn't apply to the 2018-2020 warnings and "Interior Dry Service" definition. Alternatively, Plaintiffs argue that even if the "Interior Dry Service" definition in the later catalogues count as subsequent remedial measures, such evidence could be admissible for the other purposes allowed by Rule 407, "including but not limited to impeaching Simpson witnesses and demonstrating the feasibility of precautionary measures." Opp'n at 9; *see* FRE 407.

It is possible that Plaintiffs would use evidence related to the "Interior Dry Service" definition in ways that wouldn't run afoul of Rule 407. "The range of permissible uses of evidence of remedial measures is much broader than the scope of the exclusionary rule." 5 C.

United States District Court
Northern District of California

1  Wright & A. Miller, Federal Practice and Procedure § 5285 (2d ed.).  But at this point it is too
2  early to tell, so striking the allegations is not necessary or appropriate.  Now, they're still just
3  allegations; if at some point down the line, Plaintiffs try to introduce evidence of remedial efforts
4  in a way that violates Rule 407, Simpson can challenge the use then, when the Court is better
5  apprised of the circumstances and can rule on the admissibly of that evidence.

### C.    Citations to Werdowatz's Expert Declaration

Lastly, Simpson argues that the Court should strike Plaintiffs' citations to the expert declaration of Dan R. Werdowatz because they are impermissible under Federal Rule of Civil Procedure 10.  Rule 10(c) provides that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  Simpson argues that this limits the types of documents that a party may attach to or cite within a complaint to "written instruments," and that an expert declaration is such a document.

This Court has held that "[a] 'written instrument' within the meaning of Rule 10(c) is 'a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement.'" *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (quoting *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1220 (S.D. Cal. 2001)).  The Ninth Circuit has held that "[a]ffidavits and declarations . . . are not allowed as pleading exhibits unless they form the basis of the complaint." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "Most district courts within the circuit have concluded that it is inappropriate to consider an expert affidavit on a motion to dismiss under Rule 12(b)(6), whether or not the affidavit is attached to the complaint." *Juniper Networks*, 2013 WL 2156358, at *7 (citations omitted); *id.* ("This Court is constrained by the Ninth Circuit's ruling in *Ritchie* and, in any event, agrees with the district courts that have held that expert affidavits are not appropriate exhibits to complaints.") (declining to consider an expert declaration in context of Rule 12(b)(6) motion).

Under Rule 10(c) and caselaw, the Court has no reason to and will not consider

Werdowatz's expert declaration.[4] Plaintiffs argue that they included citations to Werdowatz's declaration to "buttress" their allegations "concerning the Products' intended design, use, installation, and useful life," and that they did so "mindful of the Court's initial conclusion that the allegation that Plaintiffs expected that Products permanently embedded in concrete foundations were permanent was 'plainly false' . . . ." But that's not what the Court held. The Court found "plainly false" Plaintiffs' allegations that Simpson's High Wind-Resistant Construction Application Guide created a reasonable expectation that Simpson's products "would never corrode even if installed exactly according to Simpson's recommendations, or that Simpson's products would last the life of a house or never need to be replaced." ECF No. 57 at 10-11. Plaintiffs now allege something different, that "reasonable construction professional expectations" are "that Simpson connectors installed in original construction will last the lives of the homes in which they are installed . . . ." SAC ¶ 104. Whether or not that allegation, along with the plethora of other new allegations in the SAC, helps the SAC survive a challenge to the pleadings has not yet been tested. We are still at the motion to dismiss stage: either Plaintiffs have alleged enough to survive a motion to dismiss or they have not. There is no reason for them to include an expert declaration, because the Court did not and will not decide whether Plaintiffs' allegations are truthful or supported by evidence. *See DeMarco*, 149 F. Supp. 2d at 1221-22 ("The Court further questions whether any good reason exists for a plaintiff to attach an expert affidavit as an exhibit to a complaint. The inclusion of such an affidavit in no way relieves a plaintiff of its burden to comply with [] the applicable provisions of the Federal Rules of Civil Procedure."). And "[b]ecause the Court must generally assume the truth of all material factual allegations in a complaint, averments in an expert affidavit carry no additional probative weight merely because they appear within an affidavit rather than numbered paragraphs of the complaint." *Id.* at 1222; *Juniper Networks*, 2013 WL 2156358, at *7.

---

[4] In this case, Plaintiffs haven't even attached the declaration to the SAC. They merely cite to the docket where the declaration was filed in connection with a separate motion (Simpson's Rule 11 sanctions motion) filed in connection with the First Amended Complaint. That would be an additional reason to strike reference to the declaration as the declaration is not even properly attached to or filed with the operative complaint.

1  Nevertheless, although the Court will strike references to Werdowatz's declaration (it
2  needn't strike the declaration, because it's not attached to the SAC), the Court does not find it
3  appropriate to strike the allegations in the SAC which were derived from that declaration. *See,*
4  *e.g.*, *id.* at 1222 (holding that expert affidavit did not qualify as a "written instrument" within the
5  meaning of Rule 10(c) and thus striking it but declining to strike portions of the complaint derived
6  from the affidavit). Regardless of the source of the information or belief upon which Plaintiffs
7  make those allegations, they are allowed to make them; Simpson can challenge them later on.
8  Simpson concedes that the allegations "need not be stricken," Mot. at 9, but argues they are
9  "conclusory statements of opinion" which "carry no additional probative weight and are not
10 entitled to a presumption of truth," Reply at 8. To the extent the allegations are merely conclusory
11 they will be entitled to no weight, and the Court will treat the allegations like every other
12 allegation in the complaint.

### V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Simpson's Motion to Strike. The following references and text are **STRICKEN** from the SAC:

> All citations to ECF No. 61-2;
>
> "According to a structural engineer licensed in California for thirty-five years who has analyzed and specified Simpson products for decades, and whose declaration was previously filed in this case at ECF Document 61-2," ¶ 67;
>
> "Ultimately, the Ocean Pointe case resolved for tens of millions of dollars, most of which funded a repair program to install new anchor bolt holdown systems to replace tens of thousands of defective and corroding HD Strap-Tie Holdowns and MAS Mudsill Anchors embedded in 1,628 Ocean Pointe homes," ¶ 127;
>
> "Ultimately, the Ewa by Gentry case resolved for tens of millions of dollars, most of which funded a repair program to install new anchor bolt holdown systems to replace tens of thousands of defective and corroding HD Strap-Tie Holdowns and MAS Mudsill Anchors embedded in 2,136 Ewa by Gentry homes," ¶ 129.

**IT IS SO ORDERED.**

Dated: September 2, 2020

                                                THOMAS S. HIXSON
                                                United States Magistrate Judge