1

2

3

4              UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7    SIMON NGUYEN, et al.,                      Case No.  19-cv-07901-TSH

8                    Plaintiffs,

9            v.                                  **ORDER RE: MOTION TO DISMISS
                                                 AND REQUESTS FOR JUDICIAL
10   SIMPSON STRONG-TIE COMPANY,                 NOTICE**
     INC., et al.,
11                                               Re: Dkt. No. 75, 77, 82, 93
                     Defendants.
12

13                          **I.     INTRODUCTION**

14          Plaintiffs brought this putative class action alleging that certain structural support products

15   manufactured by Defendants and used in the construction of Plaintiffs' homes suffer from an

16   inherent defect that Defendants have been fraudulently concealing from consumers.  Pending

17   before the Court are Defendants' Motion to Dismiss ("MTD") pursuant to Federal Rules of Civil

18   Procedure 12(b)(1) and 12(b)(6), ECF No. 75, as well as multiple requests for judicial notice, ECF

19   Nos. 77, 82, 93.  Plaintiffs filed an Opposition to the Motion, ECF No. 88, and Defendants filed a

20   Reply, ECF No. 91.  Having considered the parties' positions, relevant legal authority, and the

21   record in this case, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion

22   to Dismiss for the following reasons.

23                          **II.    BACKGROUND**

24          The Second Amended Complaint ("SAC"), ECF No. 66, read in the light most favorable to

25   Plaintiffs, alleges the following.

26   The Parties

27          Defendant Simpson Strong-Tie Company, Inc. is a California corporation with its principal

28   place of business in Pleasanton, California.  SAC ¶ 14.  Defendant Simpson Manufacturing

United States District Court
Northern District of California

Company, Inc. (together with Simpson Strong-tie, "Simpson") is a Delaware corporation with its principal place of business in Pleasanton, California. *Id.* ¶ 15. Simpson develops, manufactures, advertises, sells, and distributes its standard G90 galvanized metal hurricane straps for embedment at concrete foundation edges in buildings throughout the United States. *Id.* ¶ 1. It designs and sells a variety of metal connectors for construction use with installation in a variety of locations such as home roof framing, wall framing, and concrete foundation anchors. *Id.* ¶ 67. The Simpson products installed in Plaintiffs' homes and at issue in this case are Simpson's HD Strap-tie Holdowns ("Holdowns") and MAS Mudsill Anchors ("Anchors," and together with the Holdowns, the "Products"). *Id.* ¶¶ 67, 74.

Plaintiffs are various California and Arizona homeowners. Plaintiffs Simon Nguyen and Thoai Doan are California residents who own a home in San Jacinto, California. *Id.* ¶ 8. Their home was completed in or about 2007 and they purchased it in 2009. *Id.* ¶ 17. Plaintiffs Ravi Salhotra and Sandhya Salhotra are California residents who own a home in Vacaville, California. *Id.* ¶ 9. Their home was completed in 2008 and they purchased it the same year. *Id.* ¶ 23. Plaintiff Melissa Card is a California resident who owns a home in Fairfield, California. *Id.* ¶ 10. Card's home was completed in or around 2012 and Card acquired it in 2017. *Id.* ¶ 30. Plaintiff Kevin Sullins is a California resident who owns a home in Vacaville, California. *Id.* ¶ 11. Sullins' home was completed in or about 2012 and Sullins purchased it in 2017. *Id.* ¶ 37. Plaintiff Maurice Van Roekel is a California resident and trustee of the Van Roekel Survivor's Trust, a California trust that owns a home in Temecula, California. *Id.* ¶ 12. The Van Roekel home was completed in or about 2012, Van Roekel purchased it in 2012 and transferred it to the Trust in 2013. *Id.* ¶ 44. Plaintiffs Cory Czarnick and Nola Czarnick are Arizona residents who own a home in Phoenix, Arizona. *Id.* ¶ 13. Their home was completed in 2017 and they purchased it the same year. *Id.* ¶ 51.

The Products

Installed in Plaintiffs' homes are various models of the Products, including Holdown models STHD14, STHD, STHD10, HPAHD22 and PAHD42 and Anchor models MAS and MASA, and perhaps others. *Id.* ¶¶ 18-19, 24, 26, 31, 33, 38, 40, 45, 47, 53. The Holdowns and

Anchors are embedded in the homes' concrete foundations, nailed to structural members, and covered with house wrap or exterior cladding pursuant to Simpson's installation requirements for its Interior Dry Service specifications. *Id.* ¶¶ 19(a), (b), 25, 32, 39, 46, 52.  Compliance with Simpson's instructions meant that the Products were concealed from view. *Id.*  Based in part on foundation plans for the various homes, Plaintiffs believe the Products installed on their homes were manufactured with Simpson's standard "low" G90 galvanization. *Id.* ¶¶ 20-21, 27-28, 34-35, 48-49, 54-55.  Simpson's standard "low" G90 galvanization is a very thin, zinc layer, about half the thickness of a human hair, designed to protect the Products against corrosion. *Id.* ¶ 74.  Plaintiffs allege that the models used on their homes with the G90 galvanization contain "inherent defects that are substantially certain to result in failures during the Products' useful life." *Id.* ¶¶ 21, 28, 35, 49, 55.

Hurricanes and earthquakes can pose substantial damage to buildings absent properly installed high-wind or seismic protection structural components. *Id.* ¶ 57.  Homes can be protected from the adverse effects of these forces if they have a "complete load path" or a "continuous load path" to offer protection. *Id.* ¶ 58.  Simpson markets that, as part of load paths, its structural connectors including the Products will protect homes from damage due to external forces such as gravity, wind, and seismic events. *Id.* ¶ 61; *see id.* ¶ 59.

Simpson's Wood Construction Connector Catalogs (the "Catalogs") promote and market Simpson's structural connectors to construction professionals and guide them in the selection, specification, and installation of the connectors, and include technical data on sizing and load capacities, as well as building code references. *Id.* ¶¶ 62, 64.  The Catalogs also provide corrosion information, recommendations, specifications, and warranties (the "corrosion warnings") that broadly apply to all of Simpson's connectors. *Id.* ¶ 63.  Simpson creates its Catalogs for construction professionals, who sell, purchase, analyze, recommend, specify, and install Simpson's connectors in structures. *Id.* ¶ 65.  The Catalogs are not intended for, or directly distributed to, regular homeowners like Plaintiffs, but they ultimately impact regular homeowners like Plaintiffs whose homes are built with Simpson connectors. *Id.* ¶ 66.

Most of Simpson's connectors are installed during construction in locations that are

inaccessible to and hidden from view once homes are built, including in wall cavities, floor assemblies, and concrete foundations. *Id.* ¶ 70. Locating and accessing connectors in many of these locations requires awareness of the connectors through a review of structural construction plans, construction expertise, or destruction of other building components concealing them. *Id.* Construction professionals do not consider the connectors to be serviceable components at any time during the life of a home. *Id.* ¶ 71. Unlike aesthetic, exterior, or mechanical building products, connectors by design are not supposed to experience wear and tear that materially degrades them during the life of a home. *Id.*

Simpson designed and sold its connectors to be installed only one time in a home and to last the entire life of a home. *Id.* ¶ 72. This is particularly the case for the Simpson models installed in Plaintiffs' homes, which are designed to be installed only in the original concrete pour at time of home construction and therefore cannot be fully accessed or changed during the life of a home without damaging and replacing portions of the home foundation. *Id.* Construction professionals and homeowners do not reasonably expect that the connectors will ever have to be replaced during the life of a home. *Id.* ¶ 73.

The Products are meant to be installed in the original concrete foundation of buildings, but with portions of them protruding from and exposed at the concrete foundation edges. *Id.* ¶ 84. Their top protruding portions are then nailed to other components of a building and covered behind house wrap, which is then covered with exterior cladding (usually siding or stucco). *Id.* Simpson has over the years interchangeably called this type of installation "Interior Dry Use," "Interior-Dry," "Interior Dry," or "Dry Service" applications (collectively herein, its "Dry Service"). *Id.* There is no way to install the Products unless they are embedded in a home's original concrete foundation. *Id.* ¶ 85. As such, after they are installed, there is no way to reinstall the Products, no way to fully inspect them without damaging the concrete foundations, no way to fully access them without damaging the foundations, and no way to remove or replace them without doing so. *Id.*

Simpson's Marketing

Simpson from 2005 to 2018 marketed that its G90 galvanization was sufficient to protect

4

the Products from corrosion in the exposure that occurs in the Dry Service environment. *Id.* ¶ 86. Since at least 2006, it has consistently specified and recommended its "standard" "Low" G90 galvanization for Products installed in Dry Service environments, in building framing behind house wrap and cladding. *Id.* ¶¶ 89, 92. Through 2018, Simpson's Dry Service definition included no information or warnings about the risk that that environment could contain salt, moisture, and oxygen after construction. *Id.* ¶ 87.

Simpson claims that it cannot provide estimates on the service life of its connectors due to many factors. *Id.* ¶ 97. However, Simpson has never disclosed or warned that its structural connectors, including the Products, could fail before the life of the homes even when they were properly installed. *Id.* It represented in its Catalogs through 2018 that "as long as Simpson's recommendations are followed, Simpson stands behind its product performance and our standard warranty … applies." *Id.* ¶ 98. It failed to disclose that the Products can corrode and fail even when Simpson's recommendations are followed. *Id.*

Simpson has known since 2003 that steel embedded in concrete requires adequate concrete cover, and that designing the Products to have "progressively inadequate to zero concrete cover" made them corrode and fail before the end of their useful life. *Id.* ¶ 118. Notwithstanding, Simpson designed and specified installation instructions for all the Products so that the Products necessarily have progressively diminishing to zero concrete cover. *Id.* ¶ 119. Furthermore, Simpson has known that building foundation perimeters, the location where the Products are installed, are the locations where chloride and oxygen most attack steel. *See id.* ¶¶ 119-20. However, "Simpson specified that construction professionals could achieve its defined [Dry Service] environment by embedding the Products in the concrete foundation, nailing them to structural members, and covering them with house wrap and exterior cladding." *Id.* ¶ 121. Simpson has known that use of the Products in environments that Simpson defined as Dry Service "created an inherently vulnerable, progressively inadequate to zero concrete cover zone where transmission of salt, moisture, and oxygen by concrete foundations cause corrosion in the Products well before the end of their useful life." *Id.* ¶ 123. Simpson has known that the Products have corroded and failed in locations of intended use in thousands of homes. *Id.* ¶ 125. Simpson has

thus known the Products were defective because they have prematurely failed. *Id.* ¶ 133. Simpson failed to disclose these specific defects to Plaintiffs, Class Members, and construction professionals. *Id.*

In its marketing materials, on its website, and in its Catalogs, Simpson has published false and misleading representations about the Products' design, quality, durability, performance, technical capabilities, and value. *Id.* It has omitted material information about the Products' defective design and installation, and how the Products' specific defects diminish their quality, durability, performance, and technical capabilities. *Id.* More specifically, it has never adequately warned or disclosed that the Products will prematurely corrode and weaken, and therefore prematurely fail, even when installed pursuant to Simpson's specifications and instructions, rendering them incapable of providing the same levels of protection against external forces which Simpson represented they would provide. *Id.* ¶ 137. Simpson knew this and intended for its omissions to induce construction professionals to select the Products for use in homes owned by Plaintiff and the Class Members. *Id.* ¶ 133. "As a result of Simpson's misconduct, Plaintiffs have suffered actual damages in that their Products all have the same specific undisclosed defects and have prematurely failed, will prematurely fail, and/or are reasonably certain to prematurely fail." *Id.* ¶ 141.

<u>The Claims</u>

Plaintiffs assert as causes of action: a violation of the California Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1770(a)(5) and (a)(7); a violation of the California Unfair Competition Law ("UCL"), Unlawful Business Practice, California Business and Professions Code § 17200 *et seq.*; a violation of the UCL, Unfair Business Practice; a violation of the UCL, Fraudulent Business Practice; and a violation of the Arizona Consumer Fraud Act ("CFA"), A.R.S. § 44-1521 *et seq.*; breach of express warranty; negligent misrepresentation; and fraud. Simpson moves for dismissal pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

# III.   LEGAL STANDARD

## A.   Rule 12(b)(1)

Federal district courts are courts of limited jurisdiction; "[t]hey possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted).  Accordingly, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Id.*; *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("The party asserting federal subject matter jurisdiction bears the burden of proving its existence.") (citation omitted).  Among the limits on their jurisdiction, "Article III of the Constitution confines the federal courts to adjudication of actual 'Cases' and 'Controversies.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992). Those who seek to invoke the jurisdiction of the federal courts must satisfy this threshold requirement by alleging an actual case or controversy, that they have standing.  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  Consequently, a "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Id.*  "For the purposes of ruling on a motion to dismiss for want of standing," the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

## B.   Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a party may seek dismissal of a suit for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 687.  In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.

2008); *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citations and quotations omitted).  However, a court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., [and] futility of amendment.'"  *Carvalho v. Equifax Info. Servs.*, LLC, 629 F.3d 876, 892-93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178 (1962)).

## IV.   DISCUSSION

### A.   Requests for Judicial Notice

A court may take judicial notice of, among other things, facts that are "not subject to reasonable dispute" when they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. R. 201(b).  Judicial notice may be taken at any stage of a proceeding.  Fed. R. Evid. R. 201(d).

Simpson has made two separate requests for judicial notice ("RFJN").  ECF Nos. 77 (82[1]), 93.  In its RFJN in Support of its Motion to Dismiss, Simpson requests judicial notice of six documents, attached as Exhibits A through F to the Declaration of Joseph V. Mauch:  Exhibit A, an International Code Council Evaluation Service, Inc. ("ICC-ES") Evaluation Report, ESR-2555, reissued November 2019 and revised January 2020; Exhibit B, an ICC-ES Evaluation Report, ESR-2920, reissued February 2020 and revised May 2020; Exhibit C, the first six pages of Simpson's 2006 Wood Construction Connectors Catalog; and Exhibits D, E, and F, three orders issued by a judge in the Circuit Court of the First Circuit, State of Hawaii, in actions before that court.  ECF Nos. 77, 78.

---

[1] Simpson partially duplicates its first RFJN at docket entry 82.

1    Plaintiffs filed an objection to this RFJN.  They do not object to notice of Exhibits A, B, or

2  C.  Simpson argues that these Exhibits are subject to judicial notice because they are referenced in

3  the SAC.  "Generally, a district court may not consider any material beyond the pleadings in

4  ruling on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the

5  complaint may be considered."  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542,

6  1555, n.15 (9th Cir. 1989) (citations omitted).  "Additionally, [a] court can consider documents

7  whose contents are alleged in the complaint but not attached, so long as their authenticity is not

8  questioned and the complaint necessarily relies on them."  *In re Am. Apparel Shareholder*

9  *Derivative Litig.*, 2012 WL 9506072, at *17 (C.D. Cal. July 31, 2012) (citing *Lee v. City of Los*

10  *Angeles*, 250 F.3d 668, 688 (9th Cir.2001)).  Since the parties do not dispute notice of Exhibits A,

11  B, or C, and since Plaintiffs reference them in their complaint, the Court will take judicial notice

12  of them.

13    Plaintiffs object to notice of Exhibits D, E, and F, the three court orders in cases in state

14  court in Hawaii.  They object on the ground that "taking judicial notice of findings of fact from

15  another case exceeds the limits of Rule 201."  *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir.

16  2003).  "On a Rule 12(b)(6) motion to dismiss, when a court takes judicial notice of another

17  court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of

18  the opinion, which is not subject to reasonable dispute over its authenticity.'"  *Lee*, 250 F.3d at

19  690 (quoting *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181

20  F.3d 410, 426-27 (3rd Cir. 1999)).  The Court will take judicial notice of the Hawaii court orders

21  without taking notice of any findings of fact or law expressed in those orders.  However, the Court

22  notes that Plaintiffs themselves attempt to rely on the findings expressed in those orders, and they

23  do so without requesting judicial notice of the orders.  *See, e.g.*, SAC ¶ 131 ("In summary

24  judgment proceedings, that court ultimately found . . . .").  Accordingly, the Court will also strike

25  allegations in the SAC related to the Hawaii case other than Plaintiffs' allegations of the existence

26  and general thrust of the lawsuit.[2]  *See* Fed. R. Civ. P. 12(f) (either on a motion or on its own, a

27

28  [2] All of paragraph 131 is stricken except for the first sentence: "On November 11, 2017, the Ewa
by Gentry developer sued Simpson for, among other claims, breach of its express warranties and

1   court "may order stricken from any pleading any insufficient defense or any redundant,

2   immaterial, impertinent, or scandalous matter").  Simpson's first RFJN is granted.

3          Simpson's other RFJN requests judicial notice of a complaint filed in a matter in the U.S.

4   District Court for the Central District of California.  ECF No. 93.  That request is unopposed.  It is

5   also granted.  *See United States v. Howard*, 381 F.3d 873, 876, n.1 (9th Cir. 2004) (a court may

6   take judicial notice of court records in another case) (citing *United States v. Wilson*, 631 F.2d 118,

7   119 (9th Cir. 1980)).

8   **B.     Simpson's Rule 12(b)(1) Challenges**

9          Simpson argues that Plaintiffs lack standing because they have not alleged and cannot

10  allege that they have suffered an injury in fact.

11         The "irreducible constitutional minimum" of standing consists of three elements: the

12  plaintiff must have (1) suffered an "injury in fact"—an invasion of a legally protected interest (2)

13  which is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

14  redressed by a favorable judicial decision.  *Lujan*, 504 U.S. at 560-61.  At the pleading stage, the

15  plaintiff must clearly allege facts demonstrating each element.  *Wrath v. Seldin*, 422 U.S. 490, 518

16  (1975).  To establish an injury in fact, a plaintiff must show that the invasion of her legally

17  protected interest was "concrete and particularized" and "actual or imminent, not conjectural or

18  hypothetical."  *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted).  As the

19  Supreme Court explained in *Spokeo Inc. v. Robins*:

20            Particularization is necessary to establish injury in fact, but it is not
             sufficient.  An injury in fact must also be "concrete." . . . A "concrete"
21            injury must be "de facto"; that is, it must actually exist.  See Black's
             Law Dictionary 479 (9th ed. 2009).  When we have used the adjective
22            "concrete," we have meant to convey the usual meaning of the term
             — "real," and not "abstract."
23

24  136 S. Ct. 1540, 1548 (2016).

25         Simpson argues that Plaintiffs fail to meet the injury-in-fact test because they do not allege

26  that the Products installed in their homes have actually corroded or failed in any way, none of

27  ─────────────────────

28  negligent misrepresentations.  *Gentry Homes, Ltd. v. Simpson Strong Tie Co., Inc. et al.*, U.S.
    District Court, District of Hawaii, Case No. 17-CV-00566-HG-RT."

United States District Court
Northern District of California

1   them has asserted "that they have seen even a speck of rust on the Products at their own homes,"

2   and they "also do not plead that their Products are presently exposed to corrosive conditions

3   sufficient to cause corrosion <u>at all</u> . . . ."  MTD at 11.

4       Plaintiffs counter that they have alleged that the Products are "substantially certain to fail,"

5   and argue that this is sufficient for the injury-in-fact prong of the standing inquiry.

6       The Ninth Circuit has held that "the possibility of future injury may be sufficient to confer

7   standing on plaintiffs; threatened injury constitutes 'injury in fact.'"  *Cent. Delta Water Agency v.*

8   *United States*, 306 F.3d 938, 947 (9th Cir. 2002) (citing *Ecological Rights Foundation v. Pacific*

9   *Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000)).  "If a plaintiff faces a credible threat of harm

10  and that harm is both real and immediate, not conjectural or hypothetical, the plaintiff has met the

11  injury-in-fact requirement for standing under Article III."  *Krottner v. Starbucks Corp.*, 628 F.3d

12  1139, 1143 (9th Cir. 2010) (quoting *Cent. Delta*, 306 F.3d at 950; *City of L.A. v. Lyons*, 461 U.S.

13  95, 102 (1983)) (internal quotation marks omitted).  In *Krottner*, for example, two Starbucks

14  employees sued on behalf of a class of employees after a laptop that contained the unencrypted

15  names, addresses, and social security numbers of approximately 97,000 Starbucks employees was

16  stolen from a Starbucks location.  628 F.3d at 1140-41.  The plaintiffs alleged that as a result they

17  had to vigilantly monitor their accounts to guard against future identity theft, but they did not

18  allege that any identity theft had actually occurred.  *Id.* at 1142.  The Ninth Circuit affirmed the

19  district court's finding that the plaintiffs had standing, writing that the plaintiffs had alleged a

20  "credible threat of real and immediate harm" stemming from the theft of the laptop which

21  contained their unencrypted personal data.  *Id.* at 1143.  The court contrasted the plaintiffs'

22  allegations from allegations that would be "more conjectural or hypothetical—for example, if no

23  laptop had been stolen, and Plaintiffs had sued based on the risk that it would be stolen at some

24  point in the future," which the court explained would be "far less credible."  *Id.*; *see, e.g.*, *Trew v.*

25  *Volvo Cars of N. Am., LLC*, 2006 WL 306904, at *6 (E.D. Cal. Feb. 8, 2006) (finding injury

26  standard met where plaintiff contended that every product was defective and would fail); *see also*

27  *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal. App. 4th 908, 918 (2001) ("[P]roof of breach of

28  warranty does not require proof the product has malfunctioned but only that it contains an inherent

United States District Court
Northern District of California

1   defect which is substantially certain to result in malfunction during the useful life of the
2   product.").

3        Simpson is correct that Plaintiffs have not alleged that any Plaintiff has seen corrosion on
4   any Simpson product installed in their homes.  That facts makes the standing question in this case
5   a close one.  Nevertheless, during this threshold standing inquiry, the Court must accept all
6   allegations as true and construe the complaint in Plaintiffs' favor.  *Sutton v. St. Jude Med. S.C.,*
7   *Inc.*, 419 F.3d 568, 571 (6th Cir. 2005).  Plaintiffs do allege that each of their homes "contains the
8   Products with inherent defects that are substantially certain to result in failures during the
9   Products' useful life," SAC ¶¶ 21, 28, 35, 42, 49, 55; that "[t]he Products have prematurely failed,
10  will prematurely fail, and/or are reasonably certain to prematurely fail . . . requiring Plaintiffs to
11  pay to repair damage to concrete foundations caused by the Products [and] to install different, new
12  structural connectors to replace the defective Products," *id.* ¶¶ 171, 177, 182, 188, 196, 210, 219;
13  that "Plaintiffs have suffered actual damages in that their Products all have the same specific
14  undisclosed defects and have prematurely failed, will prematurely fail, and/or are reasonably
15  certain to prematurely fail," *id.* ¶ 141; and that "corrosion caused by defects in [the Products] is
16  irreversible, requiring Plaintiffs to spend thousands of dollars to repair damage to concrete
17  foundations caused by the Products," *id.*  Construing those allegations in the light most favorable
18  to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged injury to support standing at
19  this stage.  *See Sutton*, 419 F.3d at 571 (finding plaintiff had standing where he alleged "an
20  increased risk of harm when comparing those individuals implanted with" a defective device to
21  those who were not); *see also Krottner*, 628 F.3d at 1141 (a plaintiff "need only show that the
22  facts alleged, if proven, would confer standing").

23        Plaintiffs have sufficiently alleged injury for standing.

24  **C.    Simpson's Rule 12(b)(6) Challenges**

25        **a.    The Statutory Schemes**

26        The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or
27  practices undertaken by any person in a transaction intended to result or which results in the sale
28  or lease of goods or services to any consumer."  Cal. Civ. Code § 1770(a).  Conduct that is "likely

to mislead a reasonable consumer" violates the CLRA. *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 680 (2006) (quoting *Nagel v. Twin Labs., Inc.*, 109 Cal. App. 4th 39, 54 (2003)). Plaintiffs allege that Simpson violated the provisions of the CLRA that prohibit "[r]epresenting that goods or services have . . . characteristics . . . which they do not have," and "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another." Cal. Civ. Code § 1770(a)(5), (7).

The UCL prohibits any 'any unlawful, unfair or fraudulent business act or practice.'" Cal. Bus. & Prof. Code §§ 17200, et seq. "The UCL's coverage is 'sweeping,' and its standard for wrongful business conduct is 'intentionally broad.'" *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) (quoting *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006)). "Each prong—fraudulent, unfair, and unlawful—is independently actionable." *Pirozzi*, 966 F. Supp. 2d at 920 (citations omitted). Plaintiffs allege all three prongs. "In a fraudulent omissions case like this one[3], a plaintiff can state a cause of action when the 'omission is contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obligated to disclose.'" *Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 916 (C.D. Cal. 2010) (quoting *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007)).

Arizona's CFA provides:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A). To prevail on a claim under the statute, a plaintiff must show "(1) a false promise or misrepresentation made in connection with the sale or advertisement of merchandise, and (2) consequent and proximate injury resulting from the promise." *Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 348 (D. Ariz. 2009) (citing *Kuehn v. Stanley*, 208 Ariz. 124, 129 (Ct. App. 2004)).

---

[3] Plaintiffs assert that "this is an omission case . . . ." Opp'n at 20.

United States District Court
Northern District of California

### b.      The Purported Defect

Simpson argues that the SAC fails because Simpson's corrosion warnings and guidelines do not guarantee that the products will never suffer corrosion.  According to Simpson, it warns that the Products may corrode when exposed to corrosive elements and conditions, and its warnings make no exception for Dry Service environments.  Thus, Simpson argues, "each cause of action in the SAC [] fails on its face, because each is premised on the unsupportable 'corrosion-proof if installed correctly' argument."  MTD at 12.  On Simpson's point here, the Court agrees.  For example, a 2006 Catalog—incorporated by Plaintiffs into their complaint, *see* SAC ¶ 92—states that its "[t]esting and experience indicate that indoor dry environments are *less corrosive* than outdoor environments," not that such environments are impervious to corrosive elements.  ECF No. 78-3; *id.* ("Outdoor environments are generally more corrosive to steel.").  And Plaintiffs even concede that "[s]ince at least 2006, Simpson has claimed that it cannot provide estimates on the service life of its connectors due to many factors."  SAC ¶ 97.

However, reading the SAC in the light most favorable to Plaintiffs, it alleges that Simpson designed the Products to be installed with progressively-inadequate-to-zero concrete cover, set in original concrete pours at foundations perimeters, in installations that prevented replacement or repair of the Products, exactly where chloride and oxygen mainly attack.  It alleges that portions of the Products protrude from and are exposed at the concrete foundation edges, and that Simpson understood that chloride and oxygen attack steel mainly at those locations.  Thus, the SAC alleges that Simpson designed and intended installation of the Products so they have progressively-diminishing-to-zero concrete cover at locations where Simpson knew the Products were exceptionally vulnerable to corrosion caused by transmission of salt, moisture, and oxygen.  And it alleges that since at least 2003 Simpson knew that the intended use and installation of the Products made them inherently vulnerable and caused corrosion in the Products well before the end of their useful life.  Putting aside any misinterpretation by Plaintiffs of Simpson's Dry Service definition, or Plaintiffs' contention that Simpson represents the Products will last the life of a home (no Catalog does), the SAC plausibly alleges that Simpson represented that the Products were appropriate for installations in which Simpson knew they were particularly vulnerable to corrode

14

1    and fail.  In short, Plaintiffs have alleged a plausible defect.

2                   **c.       Simpson's Knowledge**

3           Simpson also contends that Plaintiffs' allegations of Simpson's knowledge of the alleged

4    defects are not plausible.  It argues that Plaintiffs fail to allege that Simpson knew that the

5    Products were not suitable for their intended purpose.

6           "[U]nder the CLRA, plaintiffs must sufficiently allege that a defendant was aware of a

7    defect at the time of sale to survive a motion to dismiss."  *Wilson v. Hewlett-Packard Co.*, 668

8    F.3d at 1136, 1145 (9th Cir. 2012).  Plaintiffs' claims sound in fraud and thus are subject to Rule

9    9(b)'s heightened pleading standard.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04

10   (9th Cir. 2003) (Rule 9(b) applies to civil claims "grounded in fraud" or that "sound in fraud").

11   However, Rule 9(b) provides that while allegations regarding "fraud or mistake" must be alleged

12   with "particularity," "[m]alice, intent, knowledge, and other conditions of a person's mind may be

13   alleged generally."  Fed. R. Civ. P. 9(b).

14          Plaintiffs allege that Simpson has known since 2003 that steel embedded in concrete

15   requires adequate concrete cover, and that designing the Products to have progressively-

16   inadequate-to-zero concrete cover made them corrode and fail.  They allege that since 2003

17   Simpson has known that building foundation perimeters, the location where the Products are

18   installed, are the location where chloride and oxygen most attack steel.  They also allege that

19   Simpson knew that the Products have corroded and failed in locations of intended use in thousands

20   of homes.  They allege that since 2003, Simpson has attended and participated in industry

21   conferences and conducted scientific testing to evaluate corrosion of Simpson's steel connectors

22   embedded in concrete foundations.  Plaintiffs also allege that in 2011, homeowners in Hawaii filed

23   a class action lawsuit against Simpson and other defendants, and the developer in that suit used

24   tens of thousands of the same defective Products at issue here in thousands of homes since at least

25   2001.  SAC ¶ 129.  That lawsuit alleged the same defect in Products as the one at issue here.  *Id.*

26   Simpson counters that, in that suit, it has taken the position that the construction professionals who

27   built the impacted development improperly evaluated the environment and failed to follow

28   Simpson's guidelines.  MTD at 16.  Thus, it argues, no well pled allegation "could assert that

United States District Court
Northern District of California

15

1  Simpson actually knows . . . the Products are defective."  But the question at this point is only

2  whether the SAC supports the plausible inference that Simpson knew of the alleged defect.

3  Regardless of the outcome of the Hawaii suit or the success of Simpson's position there, being

4  sued because of alleged product failures in the same Products as in this case lends plausibility to

5  the allegation that Simpson was alerted to potential defects with its Products.

6      The allegations in the SAC are sufficient to plausibly allege that Simpson was aware that

7  the Products were not suitable for their intended use and installation, i.e., that the Products

8  suffered from a defect.

9              **d.     The Allegations Sounding in Fraud and Plaintiffs' Reliance**

10     Simpson argues that Plaintiffs' fraud claims fail because Plaintiffs have failed to allege

11 reliance on any misrepresentation or omission by Simpson.

12     An essential element for a fraudulent omission or false representation claim is actual

13 reliance.  *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (citing *Cohen v.

14 DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009) (CLRA); *In re Tobacco II Cases (Tobacco II)*,

15 207 P.3d 20, 39 (Cal. 2009) (UCL); *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239

16 (1995) (fraud generally)); *Kuehn*, 208 Ariz. at 129 ("[R]eliance is a required element under

17 Arizona's consumer fraud statute.") (citing § 44-1522(A)).

18     To prove reliance on an omission[4], a plaintiff must show that the defendant's fraudulent

19 conduct was an immediate cause of the plaintiff's injury-producing conduct.  *See Daniel*, 806 F.3d

20 at 1225; *see Kuehn*, 208 Ariz. at 130 (under Arizona law, "[a]n injury occurs when a consumer

21 relies, even unreasonably, on false or misrepresented information.").  "That one would have

22 behaved differently can be presumed, or at least inferred, when the omission is material," *Daniel*,

23 806 F.3d at 1225 (citing *Tobacco II*, 207 P.3d at 39), such as with alleged defects that create

24 "'unreasonable safety risks,'" *Daniel*, 806 F.3d at 1225 (quoting *Ehrlich*, 801 F. Supp. 2d at 917-

25 19).  But even though a change in behavior can be presumed if the omitted information is material,

26 a plaintiff alleging fraud must still be able to show she would have been aware of the information

27

28 ───────────

[4] Plaintiffs specify that "the substance of [their fraud claims] is fraud by omission."  Opp'n at 15.

United States District Court
Northern District of California

United States District Court
Northern District of California

had it been disclosed.  *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017) (citing *Daniel*, 806 F.3d at 1225-26).  To meet this test, a plaintiff need not prove she personally saw materials disclosing a defect, as long as she can "'establish a plausible method of disclosure and . . . that [she] would have been aware of information disclosed using that method.'" *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018) (the court could plausibly draw the inference that plaintiff would have received information on defect had Ford publicized the defect through authorized dealer) (quoting *Daniel*, 806 F.3d at 1227 (finding the same)).[5]

Simpson points out that Plaintiffs' principal theory of reliance is that, had Simpson fully disclosed the product's alleged defects, *construction professionals* would have chosen different products or installed Simpson's products differently.  *See* SAC ¶ 161 ("construction professionals would not have installed the Product in Plaintiffs' homes in the manner that they did" and thus "Plaintiffs and Class Members would not own homes built with the Products."); *id*. ¶ 97 ("no reasonable construction professional would specify, purchase, or install critical, hidden, inaccessible, and non-serviceable structural components that are prone to fail before the end of the life of a home.").  Plaintiffs concede that Simpson's Catalogs are "not intended for homeowners," and that "Simpson does not directly distribute or intend for homeowners like Plaintiffs to receive, understand, or consider its 'Corrosion Warnings' in its Catalogs or any other materials it publishes."  In sum, Plaintiffs do not plausibly allege that *they* personally would have seen any disclosures in Simpsons' Catalogs.

Since Plaintiffs do not allege that they would have seen the alleged defect had Simpson disclosed it in its Catalogs, they must allege a plausible method of disclosure to survive dismissal. In their Opposition, Plaintiffs point to their allegation that, had Simpson "amended its [] Dry Service definition to disclose [the defect],"

---

[5] The omission analysis differs for affirmative misrepresentation principles, where reliance requires the consumer to have seen or read the misrepresentation.  *Baranco*, 294 F. Supp. 3d at 967 (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 328 (2009) (in affirmative representation case, reliance satisfied where "a plaintiff alleges exposure to a long-term advertising campaign"); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 595 (9th Cir. 2012) (no presumption of reliance permitted where "it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited")).

> [c]onstruction professionals would pass on information about the revised [] Dry Service definition, and the recommendations and warnings about the Products to the end[-]user, or intended beneficiary of the Products – the consumer.  Moreover, Simpson could have designed stickers or placards to place near the installation locations to advise homeowners of the defects so that homeowners could have the Products inspected periodically to ensure performance.  Both of these actions would have resulted in the information that Simpson has failed to omit being disclosed to homeowners.

SAC ¶¶ 161-62.  This, they argue, sufficiently alleges a plausible method of disclosure.  Opp'n at 16-17.  The Court disagrees.

Although Plaintiffs do make the conclusory allegation that "[c]onstruction professionals would pass on information," SAC ¶ 162, there are no facts alleged that make that allegation plausible.  The SAC alleges no facts to show that there is a relevant channel of communication between the construction professionals who chose to install Simpson's products and the eventual purchasers of the homes.  It's important to remember what kind of communication channel would be needed here.  As Plaintiffs plausibly allege, "[h]ad Defendants fully disclosed the defects, Plaintiffs and Class Members would not own homes built with the Products embedded in concrete" because "*construction professionals would not have installed the Product in Plaintiff's homes in the manner that they did*."  SAC ¶ 161 (emphasis added).  But the fact that *non-parties* would have acted differently had the defect been disclosed does not establish *Plaintiffs' reliance* on the omission.  After all, Plaintiffs cannot sue for fraud on the ground that somebody else was defrauded.  To sue for fraud, *Plaintiffs* had to be defrauded, and *Plaintiffs* had to take some action in reliance on a misrepresentation or a material omission.  *See Daniel*, 806 F.3d at 1226 ("Here, Plaintiffs have offered sufficient evidence to create a genuine issue of material fact as to the second sub-element of reliance—whether *they* would have behaved differently if Ford had disclosed the alleged defect.") (emphasis added).

Surprisingly, despite the 221 paragraphs in the 64-page Second Amended Complaint, Plaintiffs make only one conclusory allegation about what *they* (as opposed to the construction professionals) would have done differently if they had learned of the defect.  The second half of the second sentence in paragraph 162 states that the "homeowners could have the Products inspected periodically to ensure performance."  However, that conclusory allegation flies in the

18

face of the pages of detailed allegations that the defect is inherent, including the specific allegations in paragraph 85 that the Products "are not – because they cannot be – either homeowner or contractor serviceable" and that "after the Products are embedded in the original concrete foundation pour, there is . . . no way to fully inspect the Products without damaging concrete foundations, no way to fully access the Products without damaging concrete foundations, no way to remove the Products without damaging concrete foundations, and no way to replace the Products with new versions of the Products."  The Court finds that the SAC has no well-pleaded allegations about anything the Plaintiffs would have done differently if they had learned of the defect.  This alone defeats reliance.

Nonetheless, even if we assume that the partial sentence in paragraph 162 articulates a theory of reliance, and if we also invent an additional theory of reliance nowhere mentioned in the SAC—that Plaintiffs would not have bought the homes, or would have paid less for them, had they known the defective Products were installed[6]—the SAC still needs a plausible method of disclosure.  For Plaintiffs to have known to conduct inspections or to avoid buying the home, the disclosure would have had to come *after* the home was constructed and the Products were installed (otherwise, as Plaintiffs allege, the Products would not have been used at all or would not have been installed in the Simpson-recommended manner) – this is the only way to connect *a disclosure by Simpson* to something that *Plaintiffs* would have done differently (as opposed to something that a non-party would have done differently).  So, there would need to be some kind of post-construction channel of communication for new manufacturer disclosures of defects.  For some of the Plaintiffs, the channel of communication would need to keep going for five years.  *See* SAC ¶ 37 ("The Sullins Home was completed in or about 2012.  Sullins purchased the Sullins Home in 2017.").  But nothing of the sort is alleged in the SAC.

This is what distinguishes the automobile-defect cases.  This District in *Baranco*, 294 F. Supp. 3d at 967-68, and the Ninth Circuit in *Daniel*, 806 F.3d at 1226-27, both found that Ford

---

[6] In the section of their opposition brief that discusses standing, Plaintiffs contend they have standing under the theory that they spent money to purchase homes that they otherwise would not have purchased (*see* Opp. at 10), but there are no allegations to that effect in the SAC.

dealerships could be plausible methods of disclosure for plaintiffs who had alleged that Ford omitted material information prior to them purchasing Ford vehicles.  In reaching that conclusion, the Ninth Circuit explained:

> Plaintiffs [] have evidence that Ford communicates [with purchasers] indirectly through its authorized dealerships.  Plaintiffs received information about the "characteristics," "benefits," and "quality," Cal. Civ. Code § 1770(a)(5), (7), of the Ford Focus from Ford's dealerships, which is also where they could obtain certain brochures and booklets about Ford's vehicles. . . .  And it is through its dealership network that Ford circulated its special service messages and technical service bulletins when issues arose with the Focus.  Based on this evidence, a reasonable fact finder could conclude that Ford knew that its consumers depended at least in part on its authorized dealerships for information about its vehicles and that Ford's authorized dealerships would have disclosed the alleged rear suspension defect to consumers if Ford had required it.

*Daniel*, 806 F.3d at 1227.  Similarly, in *Baranco*, the court explained:

> Though [plaintiff] does not specifically allege that she received information or promotional information from Ford or its agents at the dealerships, the Court can plausibly draw an inference in her favor that she could have received such information had Ford publicized the defect through the dealer, as it is highly improbable that she purchased her vehicle from a dealership without any exchange of information whatsoever (or at least an opportunity for such an exchange).

294 F. Supp. 3d at 967-68.  So, yes, in both of those cases the courts found a third party was a plausible method of disclosure.  But those cases are inapposite; in those cases, the dealerships were an intermediary between Ford, the manufacturer, and the plaintiffs, who were the ultimate buyers.  The supposition was that because dealerships were ordinary sources of "information about the 'characteristics,' 'benefits,' and 'quality,'" to purchasers of Ford's vehicles, they would be plausible channels through which Ford could have disclosed defects.  In this case, on the other hand, the construction professionals are not go-betweens.  Plaintiffs do not allege any facts to show that Simpson uses construction professionals to provide information to home purchasers, or that there is any existing path of communication between the construction professionals who select Simpson's Products and the potential homeowners who buy the homes later.  Indeed, they pretty much allege the opposite, claiming that the intended audience for Simpson's marketing is construction professionals, not homeowners like Plaintiffs, SAC ¶ 66, and that the construction professionals do not consider the Products to be either homeowner or contractor serviceable at any

1    time during the life of the home, *id*. ¶ 71.  The SAC plausibly alleges that if Simpson had

2    disclosed the defect *before* the construction professionals installed the products, they would either

3    not have used the Products at all or would have installed them differently – but again, that shows

4    only non-party reliance.  The SAC does not allege any facts to show that a channel of

5    communication exists between the construction professionals and potential home purchasers for

6    defects the professionals learn about after – sometimes years after – they have installed the

7    Products.  For example, car companies are required by law to issue recall notices for defects they

8    learn of after a sale has happened.  There are no factual allegations in the SAC that the

9    construction professionals who install Simpson's Products do anything similar.

10          The reason for this is not surprising.  Car companies use dealerships to describe the

11   benefits of their cars to potential purchasers for the purpose of influencing people to buy their cars.

12   Pharmaceutical companies use physicians to describe the benefits of their products to consumers

13   to encourage people to buy their products.  By contrast, the SAC does not allege that Simpson

14   makes any effort to encourage people to buy homes that have Simpson's Products installed in

15   them.  And certainly, there are no allegations that Simpson enlists the construction professionals,

16   either directly or indirectly, to communicate any information to potential home buyers, nor that

17   they do so on their own.  Accordingly, if Simpson had disclosed the defect to the construction

18   professionals, there are no factual allegations to render it plausible that the Plaintiffs "would have

19   been aware of a disclosure," *Daniel*, 806 F.3d at 1226.

20          That leaves us with Plaintiffs' argument that they've alternatively alleged that Simpson

21   itself would be the plausible method of disclosure because "Simpson could have designed stickers

22   or placards to place near the installation locations to advise homeowners of the defects so that

23   homeowners could have the Products inspected periodically to ensure performance."  This

24   allegation, which amounts to a hypothetical instead of an allegation of fact, is too far-fetched and

25   doesn't move the needle.  Plaintiffs are suggesting that Simpson could go out and put stickers or

26   placards near to installation locations at every home constructed with its Products.  But that's

27   likely outside the realm of what's possible (or legal), and no allegation's been made that Simpson

28   is in the business of building homes, or that Simpson has any way to track every home built with

United States District Court
Northern District of California

21

its products, or which of its products are used in which home, and so on.  Finally, Plaintiffs cite no caselaw which suggests a plaintiff can allege a plausible method of disclosure by conjuring up a hypothetical channel of communication that does not exist yet.  The inquiry concerns the plausibility of a plaintiff obtaining information from an existing source, not what potential new sources of communication could be created.  The latter would yield endless possibilities for a plaintiff to plead reliance out of thin air.  Plaintiffs do not allege a plausible method of disclosure. Therefore, they do not plausibly allege actual reliance for purposes of their fraud-by-omission claim.

To the extent Plaintiffs mean to allege fraud by misrepresentation (though they assert this is a case of omission), Plaintiffs again fall short.

> The Restatement Second of Torts [(the "Restatement")] section 533, articulates the relevant principle in this way:  "The maker of a fraudulent misrepresentation is subject to liability . . .  to another who acts in justifiable reliance upon it *if* the misrepresentation although not made directly to the other, is made to a third person and *the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other*, and that it will influence his conduct in the transaction or type of transactions involved."

*Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1095-96 (1993) (emphasis added); *id.* at 1097 ("A representation made to one person with the intention that it shall reach the ears of another, and be acted upon by him, and which does reach him, and is acted upon by him to his injury, gives the person so acting upon it the same right to relief or redress as if it had been made to him directly.") (citations and internal quotation marks omitted).  Under this principle, a plaintiff must allege that the defendant made a misrepresentation to a third-party with the *intent* it would be repeated by the third-party to the plaintiff, or that the defendant had information that gave him special *reason to expect* that it would be communicated to the plaintiff and would influence their conduct." Restatement § 533, comment d (emphasis added).

Plaintiffs do not allege that they or any other homeowners ever received Simpson's Catalogs or that they were ever intended to.  Quite to the contrary, they allege that Simpson's Catalogs are "not intended for homeowners" and that "Simpson does not directly distribute or intend for homeowners like Plaintiffs to receive, understand, or consider its 'Corrosion Warnings'

22

1    in its Catalogs or any other materials it publishes."  Thus, Plaintiffs do not plausibly allege that

2    Simpson intended or expected that its representations to construction professionals would ever end

3    up with Plaintiffs.  They do not plead facts showing they are entitled to relief under a theory of

4    fraud by misrepresentation.

5           Accordingly, Plaintiffs cannot show reliance and cannot proceed with their claims

6    sounding in fraud.  Their first, fourth, fifth and eighth causes of action are dismissed.

7    Additionally, Plaintiffs' negligent representation claim, their seventh cause of action, fails.  That

8    claim, like the other fraud claims, is predicated on Plaintiffs' allegations that Simpson "made

9    factual representations and material omissions about the Products," "intend[ing] that Plaintiffs,

10   Class Members, and/or construction professionals . . . rely on those representations and omissions

11   about the Products . . . ."  SAC ¶¶ 200, 202; *see also id.* ¶¶ 204-207 (alleging how Simpson's

12   "representations and omissions caused and contributed to the injury suffered").  Plaintiffs assert

13   that "[n]egligent misrepresentation is not the same as the negligent design/failure to warn claim

14   that Plaintiffs alleged in the FAC.  Rather, negligent misrepresentation is a variant of fraud."

15   Opp'n at 22; *id.* ("Simpson discusses negligent misrepresentation in the fraud section of its brief,

16   tacitly conceding that Plaintiffs' negligent misrepresentation claim alleged here is a variant of

17   fraud."); *id.* (citing the Court's earlier finding that "the economic loss rule does not bar Plaintiffs'

18   fraud claim").  Thus, Plaintiffs' seventh cause of action is also dismissed.  Plaintiffs' second

19   claim, the UCL unlawful business practice claim, is dismissed to the extent it is founded on any of

20   these claims.[7]

21               **e.       The Breach of Express Warranty Claim**

22          Simpson argues that Plaintiffs' common law breach of express warranty claim fails

23   because they cannot show that Simpson's warranty was part of the benefit of the bargain.

24          To prevail on a breach of express warranty claim, Plaintiffs must show: (1) Simpson's

25   statements constitute an affirmation of fact or promise or a description of the goods; (2) the

26   statement was part of the basis of the bargain; and (3) the warranty was breached.  *Davidson v.*

27

28   _____

     [7] Simpson's additional arguments for dismissal of these claims are mooted.

United States District Court
Northern District of California

*Apple, Inc.*, 2017 U.S. Dist. LEXIS 36524, at *33 (N.D. Cal. Mar. 14, 2017) (citing *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010)).  Simpson argues that Plaintiffs cannot plead facts sufficient to satisfy any of these elements, but its argument really concerns only the second.  Simpson argues that Plaintiffs do not and cannot allege that Simpson's corrosion warnings formed part of the basis of a bargain.  According to Simpson, Plaintiffs cannot do so because they did not receive the warranty information.

Because Plaintiffs plainly have the warranty information now, Simpson's argument necessarily boils down to timing.  Unlike the fraud-based claims discussed above, California no longer requires reliance for a claim of breach of warranty.  "[T]he concept of reliance has been purposefully abandoned."  *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010) (citation and quotation marks omitted); *see also id.* ("While the tort of fraud turns on inducement, as we explain, breach of express warranty arises in the context of contract formation in which reliance plays no role.").  "'The precise time when words of description or affirmation are made . . . is not material'—even promises made after purchase, such as those contained in product manuals, constitute an 'affirmation of fact or promise' if it can be 'fairly . . . regarded as part of the contract.'"  *McVicar v. Goodman Glob., Inc.*, 1 F. Supp. 3d 1044, 1057 (C.D. Cal. 2014) (citing *Weinstat*, 180 Cal. App. 4th at 1230.); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 972 (N.D. Cal. 2014) ("According to Ford, 'basis of the bargain' means that Plaintiffs must have been aware of and relied on the limited warranty prior to purchasing their vehicles—i.e., without reliance, no express warranty claim is viable.  The Court does not agree.").  "The ultimate question is what the seller in essence agreed to sell."  *In re Nexus 6P Prods. Litig.*, 293 F. Supp. 3d 888, 916 (N.D. Cal. 2018) (citation and quotation marks omitted).

Further, Plaintiffs explicitly allege that "[a]t a minimum, Plaintiffs and Class Members are intended third-party beneficiaries of Defendants' express, written warranties" contained in Simpson's Catalogs.  SAC ¶¶ 191-92; ¶ 105 ("Simpson's warranties are intended to benefit homeowners who own Simpson connectors at the end of their known and intended stream of commerce, such as Plaintiffs and the Class.  Thus, Plaintiffs and the Class were intended and/or third-party beneficiaries of Simpson's warranties.").  California has codified the third-party

beneficiary exception to privity. *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d at 922 (citing Cal. Civ. Code § 1559). "'Because third party beneficiary status is a matter of contract interpretation, a person seeking to enforce a contract as a third party beneficiary must plead a contract which was made expressly for his or her benefit and one in which it clearly appears that he or she was a beneficiary.'" *Nexus 6P*, 293 F. Supp. 3d at 922 (quoting Schauer *v. Mandarin Gems of Cal., Inc.*, 23 Cal. Rptr. 3d 233, 239 (Ct. App. 2005)). Plaintiffs sufficiently do so. *See, e.g.*, *Nexus 6P*, 293 F. Supp. 3d at 922-23 (finding third-party beneficiary allegations sufficient where complaint alleged that "Plaintiffs and Class members are the intended third-party beneficiaries of the implied warranties and other contracts between Defendants and the retailers who sell the Phones. Defendants' warranties were designed for the benefit of consumers who purchase(d) Phones."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 982, n.15 (N.D. Cal. 2014) (finding third-party beneficiary allegations sufficient where plaintiffs alleged third parties "were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010) (finding third-party beneficiary allegations sufficient where plaintiffs alleged that they "were the intended consumers" and facts "tending to support that they are third-party beneficiaries."). Accordingly, Plaintiffs have pled a claim for breach of express warranty.

> **f.      The Arizona Plaintiffs and the CLRA and UCL**

Simpson argues that the SAC improperly alleges CLRA and UCL claims by out-of-state plaintiffs, the Arizona plaintiffs.

Neither the CLRA nor the UCL applies to actions occurring outside of California that injure non-residents. *Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, 2010 WL 3619884, at *8 (N.D. Cal. Sept. 10, 2010) (UCL) (citations omitted); *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1130 (N.D. Cal. 2014) (CLRA). "State statutory remedies under the CLRA and UCL may be available to non-California residents if those persons are harmed by wrongful conduct occurring in California." *In re Toyota Motor Corp.*, 785 F. Supp. 2d

United States District Court
Northern District of California

1   883, 916 (C.D. Cal. 2011) (emphasis in original) (citations omitted).  "In determining whether the

2   UCL and CLRA apply to non-California residents, courts consider where the defendant does

3   business, whether the defendant's principal offices are located in California, where class members

4   are located, and the location from which advertising and other promotional literature decisions

5   were made."  *Id.* at 917.  But "[t]he critical issues [] are whether the injury occurred in California

6   and whether the conduct of Defendants occurred in California.  If neither of these questions can be

7   answered in the affirmative, then [a] Plaintiff will be unable to avail herself of these laws."

8   *Tidenberg v. Bidz.com, Inc.*, 2009 WL 605249, at *4 (C.D. Cal. Mar. 4, 2009).

9           Here, Plaintiffs allege that Simpson's principal place of business is in California, and that

10  "Simpson's marketing and advertising decisions are made in" California.  SAC ¶ 15.  Plaintiffs'

11  remaining claims, its claims under the UCL, allege that Simpson "failed to adequately warn . . . of

12  the defects," *id.* ¶ 169, and that it "engaged in an unfair business practice by failing to disclose

13  material safety facts concerning the Products that they had a duty to disclose," *id.* ¶ 174.  Plaintiffs

14  have thus alleged "with sufficient detail that the point of dissemination from which advertising

15  and promotional literature <u>that they saw or could have seen</u> is California."  *In re Toyota*, 785 F.

16  Supp. 2d at 917 (emphasis in original).  They've also alleged that Simpson does business in

17  California and that its principal offices are in California.  This is enough for the Arizona plaintiffs

18  to seek relief under the UCL.

19  **D.      Leave to Amend**

20          For the claims being dismissed, dismissal with prejudice is warranted.  This is Plaintiffs'

21  third attempt at pleading, and despite having introduced a host of new plaintiffs and a plethora of

22  new allegations, they've still failed to cure serious deficiencies that strike at the core of their

23  complaint.  The major deficiency in the Second Amended Complaint is the lack of any allegations

24  to show a plausible method of disclosure to make their reliance theory plausible for the claims

25  sounding in fraud.  The Court's order dismissing the First Amended Complaint gave the Plaintiffs

26  leave to amend their claims sounding in fraud and specifically noted the absence of any allegations

27  establishing a plausible method of disclosure.  ECF No. 57 at 14 ("The Court declines to address

28  the theoretical question of whether that could be a plausible method of disclosure because, as

1    Simpson correctly observes, Plaintiffs have not alleged any facts in the FAC in support of such a

2    theory.  Under the current state of the pleadings, the Court agrees with Simpson that Plaintiffs

3    have not plausibly alleged reliance.").  Plaintiffs' inability to solve this problem in the SAC

4    confirms that no new allegations could possibly cure the problems with Plaintiffs' fraud claims.

5    Accordingly, the Court will dismiss them with prejudice.

6                                    **V.    CONCLUSION**

7            For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART**

8    Simpson's Motion to Dismiss.  Plaintiffs' first, fourth, fifth, seventh, and eighth claims are

9    **DISMISSED WITH PREJUDICE**.  Plaintiffs' second cause of action is dismissed to the extent

10   it is predicated on any of those claims.  Defendant shall file an Answer by September 23, 2020.

11           **IT IS SO ORDERED.**

12   Dated: September 8, 2020

13

14                                             THOMAS S. HIXSON
                                               United States Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28