Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L. Thompson, Judge

RAVI SALHOTRA, et al.,           )
                                 )
            Plaintiffs,          )
                                 )
   VS.                           )     NO. C 19-07901 TLT
                                 )
SIMPSON STRONG-TIE COMPANY, et   )
al.,                             )
                                 )
            Defendants.          )
_____)

                      San Francisco, California
                      Tuesday, October 29, 2024

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                  LIPPSMITH LLP
                  555 South Flower Street - Suite 3000
                  Los Angeles, California  90071
             BY:  **GRAHAM B. LIPPSMITH, ATTORNEY AT LAW**

                  MORGAN & MORGAN
                  711 Van Ness Avenue - Suite 500
                  San Francisco, California  94102
             BY:  **MICHAEL F. RAM, ATTORNEY AT LAW**

                  KASDAN TURNER THOMSON & BOOTH, LLP
                  1280 Civic Drive - Suite 200
                  Walnut Creek, California  94596
             BY:  **SCOTT THOMSON, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

1    **APPEARANCES:**  (continued)

2    For Defendants:

3                          SHARTSIS FRIESE LLP
                           425 Market Street - Eleventh Floor
                           San Francisco, California  94105

4                    **BY:   ERICK C. HOWARD, ATTORNEY AT LAW**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Tuesday - October 29, 2024**                           **3:22 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Now calling case number 19-CV-07901, |
| 5 | Salhotra, et al. versus Simpson Strong-Tie Company, Inc., et |
| 6 | al.  Counsel, please all come forward and state your |
| 7 | appearances with beginning with the Plaintiff. |
| 8 | (Pause in proceedings.) |
| 9 | **THE COURT:**  Identify yourselves beginning with the |
| 10 | Plaintiff but wait until everybody has set up, and co-counsel |
| 11 | can be seated if they choose at this time; and I'm certain that |
| 12 | counsel will do a good job of identifying each of you. |
| 13 | **MR. LIPPSMITH:**  Good afternoon, Your Honor, Graham |
| 14 | LippSmith here on behalf of the Plaintiffs.  We also have Scott |
| 15 | Thomson and Mike Ram.  And I will be addressing the motion for |
| 16 | class certification and the motion to dismiss per judgment on |
| 17 | the pleadings, and Mr. Thomson will be addressing the Daubert |
| 18 | issues on the motion to strike the expert. |
| 19 | **THE COURT:**  All right. |
| 20 | **MR. HOWARD:**  Good afternoon, Your Honor, Erick Howard |
| 21 | for Simpson Strong-Tie Company, Inc. and Simpson Manufacturing, |
| 22 | Inc. |
| 23 | **THE COURT:**  Good afternoon.  Now then, Counsel, |
| 24 | because we were so tight on time, we made sure you had all of |
| 25 | our questions in advance, we thought that would give you some |

1    time for reflection.  It would give us all of the information

2    we need, and the questions you received today is if the Court

3    were to deny the judgment on the pleadings request; and we were

4    moving towards class certification and the Daubert motion.

5        This means that the previously provided responses were to

6    the Court's satisfaction in assisting the Court in making its

7    determination, but I wanted to address the class certification

8    and Daubert motion in person because it was the Daubert motion

9    that had this case returned after the appeal.

10       So, I would ask that you first address the motion for

11   certification; second, the Daubert motion, and then any

12   residual issues that you think were not covered in your answers

13   to the Court on the other remaining motions.  I think that will

14   be the most helpful and the most efficient way for us to use

15   our time this afternoon.

16           **MR. LIPPSMITH:**  Thank you.

17           **THE COURT:**  All right.

18           **MR. LIPPSMITH:**  On the class cert motion -- then we

19   will get straight to it -- question number 1 is about whether,

20   for typicality if there are -- if the Plaintiffs who we propose

21   to be class representatives are subject to statute limitations

22   defenses, would that be dispositive on the motion for class

23   certification?

24       And this does tie in a little bit with the motion for

25   judgment on the pleadings a bit.  Simpson has not raised a

statute of limitations defense about the Plaintiffs Card or
Tumelson with respect to the UCL claim.  They limited that to
the breach of warranty claim only on the motion for judgment on
the pleadings.

**THE COURT:**  Let's set the table a little bit.  Who are
we talking about?  What's going on?  Where are these Plaintiffs
and the status of the homes that we are talking about?  And
then let's move right on in to that.

**MR. LIPPSMITH:**  So, we have been moving through this
case for several years.  Certain Plaintiffs have gone away
because they passed away or they sold their home, and we are
kind of down to these Plaintiffs here.

Melissa Card is one of the original Plaintiffs in, I
think, the first amended complaint, I believe it was.  I don't
think she was in the original complaint when this case was
filed.

And Ms. Tumelson came in because she purchased her home
from a Plaintiff who used to be in this case named Sullins.
Sullins owned the home.  He was one of the early Plaintiffs in
the case; sold the home to Tumelson and in that process had
disclosed the existence of the litigation and the issues.  And
so, that brought Tumelson forward to stand in the shoes
essentially of Sullins that they had previously occupied while
Sullins owned the home.

So, for this case, the statute of limitations defense is

1  generally -- I don't think that they impact whether or not they

2  can serve as typical class representatives here.

3      Of course, if the Court finds that a statute of

4  limitations defense is granted -- like on the motion for

5  judgment on the pleadings on the warranty claim, for example --

6  then that's dispositive of the claim; and they, of course,

7  would not be able to represent anybody.

8      But going back to it, that's why it is important to note

9  that there was never a statute of limitations defense asserted

10  in a motion for judgment on the pleadings against either of

11  these Plaintiffs on the UCL claims.  It was limited just to the

12  breach of warranty claims.

13      With respect to the breach of warranty claim, the issue

14  is, you know, is it a future performance warranty?  Is it a

15  lifetime warranty?  And to the extent that there are some

16  questions about that, I think the focus there is turning on the

17  Defendants' conduct, not the Plaintiffs' conduct.

18      These Plaintiffs are reasonable people and the standard

19  for judging what they knew or should have known or could have

20  discovered using reasonable diligence is a reasonable person

21  standard.  It is not necessarily specific to Ms. Card or to

22  Ms. Tumelson.  It's measured by being a reasonable person.

23      I will point you to a decision called *Tait versus BSH Home*

24  *Appliance*, 289 F.R.D. 466.  That's a Central District of

25  California order from 2012 where they talked about how

1    individual issues of discovery are not -- are not the kinds of

2    things that could subsume a class cert motion or any good

3    reason to deny class certification because primarily the focus

4    of the conduct here is on the Defendant and what a reasonable

5    person would know or not know in light of what the Defendant

6    had done.

7         So, for -- just generally speaking, I don't think that

8    this is a mare on the typicality argument for these folks.  To

9    the extent that there has to be some kind of tolling on their

10   statute of limitations for a date of discovery or if the Court

11   finds that the warranty is not a lifetime warranty and there

12   are timing issues there.

13        Turning to question number 2, I will let Defense Counsel

14   address that issue.  I think the Court is spot on citing the

15   Ninth Circuit *Waln* decision here, and we cited that extensively

16   in the briefing.

17        For the adequacy issue, the questions about how the claims

18   for the proposed representative Plaintiffs, Ms. Card and

19   Ms. Tumelson were discovered and were they solicited by

20   counsel, the history with these Plaintiffs, Tumelson bought the

21   home after Sullins had initiated the litigation.  So, there was

22   a disclosure as part of the sale of the home that the

23   litigation was proceeding.  And so, Tumelson wanted to come

24   step forward and stand in the shoes of Sullins.

25        For Card and Sullins, originally they were -- they had

1    retained one of the Plaintiffs' firms involved in this case for

2    their construction defect claims.  So, they were preexisting

3    clients and they testified about that.

4         A kind of funny wrinkle in California law is under regular

5    construction defect cases, they are brought under what we all

6    call SB 800, which is the Contractor Right To Repair Act.  And

7    that is pretty much one of the only means to pursue those kinds

8    of claims for construction defect distinct from unfair

9    competition claims or breach of warranty claims, which we are

10   talking about here.

11        And in those cases you cannot file -- there is a decision

12   called *Kohler* in California that says that under SB 800 you

13   cannot file a class claim against a manufacturer unless it

14   manufacturers the product on-site essentially.

15        So, insofar as their claims were concerned with the other

16   representation that they had on their construction defect

17   claims, they did not have the ability to pursue a class claim

18   against Simpson within those California cases that they had

19   previously filed.

20        So, that's why they came forward here with the breach of

21   warranty claim and UCL claims, which are distinct and different

22   from the -- one of the MIL construction defect claims that they

23   had pursuit against the builders.

24        **THE COURT:**  And with regards to the warranty, you

25   mentioned whether the Court has made a determination about

1  whether it's a lifetime warranty or one that has a specified

2  lifetime short of a lifetime warranty.  What is your position

3  about these circumstances?

4       **MR. LIPPSMITH:**  I think here if -- to read anything

5  other than this is a lifetime warranty, I think, would render

6  the warranty meaningless.  Effectively what the Defense are

7  seeking is by statute limiting the warranty to a four-year

8  warranty, and that's just not what the warranty provides.

9       The warranty is clear that it -- it warrants -- it

10 warrants that the connectors are designed to enable structures

11 to resist the movement, stress and loading that results from

12 impact event such as earthquakes and high velocity winds.  And

13 this is distinct a little bit from some of the cases they had

14 cited.  They had cited some cases where they talked about

15 advertising materials or statements about products that were

16 made outside of the warranty where people were trying to infer

17 the time period on the warranty that was not provided in the

18 express warranty itself.

19      Here, what we have is a very different situation.  Our

20 language is actually in the warranty itself.  And to me, that

21 if there is any shortening of that time period, it would render

22 the warranty ineffective and meaningless; and I don't think the

23 Court can do that.  It is a one-sided warranty that they

24 drafted.  And I think to the extent that any construction is

25 done on the warranty, it has to be construed against the

1  warrantor, here Simpson.

2      **THE COURT:**  Thank you.  All right, Counsel, if you

3  likewise will set the table --

4      **MR. HOWARD:**  Yes.

5      **THE COURT:**  -- with regards to the products by Simpson

6  Strong-Tie Company and -- et al. and the purpose of the product

7  and what it ensures or what it is set up to prevent.

8      **MR. HOWARD:**  Thank you, Your Honor.  So, the

9  products -- there are two families of product.  One is called

10 the strap-tie holddown.  These are large sort of J-shaped

11 straps that are inserted into the concrete, and they attach

12 to -- they attach to the sill plate into the upper framing of

13 the house.  And so, they are designed to -- as we have already

14 pointed out -- to resist seismic and wind loads by making sure

15 that the house stays on the foundation for some -- for

16 different types of these types of holddowns were put in place,

17 you can just have a house that just sits on the foundation -- I

18 think still done in the Midwest -- and they may blow off the

19 foundation during a tornado or some other wind event.  So,

20 that's the strap-tie holddown.

21      The mudsill anchors or MASs or MASAs, as they are

22 denominated by Simpson, those also are inserted into the

23 concrete and they attach to the sill plate.  And so, they

24 really hold down the sill plate.  You don't have the framing

25 that is on top of that.  Sometimes, I think they can be

1   actually connected to, you know part of the framing; but their

2   main purpose is to connect to the sill plate so they will keep

3   the sill plate in place, and you have the framing -- the rest

4   of the framing that is on top of that; and that is then held

5   down onto the sill plate and the rest of the framing of the

6   house.

7        So, that is their purpose.  Like all of our -- like all of

8   Simpson's parts, these parts are made of steel; and Simpson

9   warns -- and has warned throughout the period that these homes

10  were built and before -- steel can corrode.  And if different

11  types of -- depending on -- well, depending on the exposure to

12  moisture and corrosive elements, the -- these parts can exhibit

13  corrosion.  The exhibition of corrosion in and of itself is not

14  a failure or a defect in the part because all metal wants to

15  become rust.  It's what an expert has told me one time.

16       So, you can do -- you try to prevent the parts from being

17  exposed to moisture and corrosive elements in different ways.

18  One of those ways is to use -- it's called galvanization --

19  zinc galvanization on top of the carbon steel.  You can use

20  lesser or more thicknesses of this galvanization.  The more

21  galvanization you put on it, the more corrosion resistant it

22  is.  The less that you put on it, the less corrosion resistant

23  it is.  But none of that galvanization will make the part

24  corrosion proof, so the part can still exhibit corrosion at

25  some point during its life.

1        The fact that it exhibits corrosion does not represent a

2    failure of the part.  The parts -- particularly for the Simpson

3    parts -- the Simpson -- Simpson provides load values for the

4    amount of forced -- sheer force and other types of forces that

5    the parts can withstand.  And they do testing to determine, you

6    know, this part can take 2,000 pounds of force and, you know,

7    different number -- different --

8              **THE COURT:**  Tornado or hurricane?

9              **MR. HOWARD:**  Correct.

10             **THE COURT:**  These homes are located where?

11             **MR. HOWARD:**  These homes are located -- most of these

12    homes are located in Northern California, in Vacaville;

13    Fairfield I believe a couple of the homes; and then I believe

14    Ms. Allen's home, I believe, is in Riverside County.  I'm not

15    precisely sure but farther south.

16             **THE COURT:**  So, these are not homes that would be

17    subject to hurricanes, tornadoes, maybe a tsunami depending

18    on --

19             **MR. HOWARD:**  Right.

20             **THE COURT:**  -- whether it is coastal?

21             **MR. HOWARD:**  Yeah, these homes are much more likely to

22    be subject to seismic events rather than wind events.

23             **THE COURT:**  Okay.

24             **MR. HOWARD:**  So, you -- in using the -- these parts,

25    the construction professionals who use them have to be aware --

1  and they are aware -- of the environments in which they are

2  going to put the parts.

3      The building code provides numerous -- numerous ordinances

4  and regulations that govern how a home is to be built and the

5  protection that that home is to get from moisture and corrosive

6  elements.

7      So, for instance, the type of concrete that you use is a

8  variable that's important in whether or not a part that's

9  embedded -- a steel part that's embedded may experience

10  corrosion.  The denser that concrete, the less likely it is

11  going to experience corrosion.  The less dense that concrete,

12  the more likely that it may experience corrosion depending on

13  other factors such as whether or not the house has been -- you

14  know, if it sits in a valley, the water runs down onto it or if

15  it sits on a hill and water runs away from it.  If the grading

16  of the home is done correctly, then water that comes onto the

17  home will flow away from it; and that house may not see as much

18  corrosion as a house where, again, the grading has the water

19  sliding toward the home.

20          **THE COURT:**  All right.  And that brings me to the

21  warranty question.  Counsel says that it's clear that this is a

22  warranty that is a lifetime warranty as opposed to a four-year

23  warranty.  Your position.

24          **MR. HOWARD:**  It is not a lifetime warranty.  The Ninth

25  Circuit has adopted the narrow -- the narrow rule for finding

1    a -- warranties that have these extended specified, you know,

2    times of the warranty; and you have to specify -- you know, you

3    have to specify the amount of time and be definite about that.

4        If you are -- if it's ambiguous, then the inference to be

5    provided to that warranty is that it's talking about present

6    condition.  And our warranty talks about the present condition.

7        If you install -- what we say is that if you install the

8    part correctly and you follow our recommendations, that they

9    will perform in accordance with their design, limitations, and

10   the design specifications that we have provided for them.

11       We don't have a -- a design specification that says that

12   the part is corrosion proof and it will never experience

13   corrosion even if you install it correctly.

14       **THE COURT:**  Does it indicate that it is corrosion

15   resistant?

16       **MR. HOWARD:**  It does say that it is corrosion

17   resistant, and we are very clear that corrosion resistant does

18   not mean that it will never experience corrosion during its

19   service life.  We have a clear warning that says these parts

20   are made of metal.  They can experience corrosion.  You need to

21   do periodic inspection, maintenance and replacement may be

22   necessary.  If you do see corrosion, that does not mean that

23   the part has failed.  You need to do an assessment and then you

24   can take, you know, remedial action.  It doesn't necessarily

25   affect the part's performance.

1        That's because these parts are -- you know, the metal has

2    a certain amount of thickness, and that amount of thickness is

3    what is determining what its load value is as well as the

4    different parts of the design that we put into it.  So, you

5    have to lose enough of the metal, the actual metal, for the

6    part to fail in -- under Simpson's definition of what a failure

7    would be.  Simpson's definition of a failure, which is

8    communicated in its materials, is that the part loses the

9    ability to hold the load capacity that we have provided for it,

10   that we have stated that the part can hold.

11       So, if you lose half your -- if losing half of the metal's

12   density to corrosion would cause the part no longer to be able

13   to hold 2,000 pounds of force or resist 2,000 pounds of force

14   but go back down to a thousand pounds of force and we said it

15   would hold two thousand, that would be a failure.  The fact

16   that it exhibits some corrosion, that's not a failure.

17       **THE COURT:**  Well, Counsel is inviting the Court to

18   look at this using the reasonable person standard.  And their

19   argument -- and they can correct me if I'm wrong -- that

20   somebody purchases a house with these products and they are

21   looking at the conduct of the Defendant -- not the conduct of

22   the Plaintiff -- that the expectation is that this product will

23   last the lifetime of the home.

24       **MR. HOWARD:**  Unfortunately for the purchaser of the

25   house, they are not the party who was involved in the

1  benefit -- involved in the bargain in connection with the

2  purchase of the part.  These parts are purchased by a

3  construction professional.  And at best -- and I don't believe

4  that the Plaintiffs have shown this -- but at best, they would

5  be third-party beneficiaries of the contracts between Simpson

6  and a down-the-line developer who builds the homes.  That

7  construction professional who built their house, they are

8  subject to the limits of the warranty that we provide.

9        The downstream purchaser of the house may have remedies

10 against their developer -- you know, issues happen -- but

11 they -- that downstream, you know, homeowner who purchases the

12 house cannot change the parameters of the warranty; and it

13 cannot change what the -- they cannot change what the

14 developer -- whoever purchased the parts from Simpson agreed to

15 in terms of the limitations when they purchased it.

16       The purchase -- a construction professional who purchases

17 the Simpson parts understands that metal in a home can corrode.

18 And so, it is their responsibility to try to ensure that the

19 parts are not exposed to conditions that would cause them to

20 corrode.

21       That is part of the benefit of the bargain that they are

22 getting.  They are getting these parts but they understand the

23 limitation of this part.  The downstream homeowner cannot

24 expand that and say, Well, no, I get -- now that I bought the

25 house, I now get a lifetime warranty that the part would never

corrode and that this part will always work for as long as I
live.

     That's simply not something that Simpson says.  Simpson
has, you know, four pages of warnings at the beginning of their
materials that talk all about corrosion trying to warn those
who are going to purchase those parts -- the construction
professionals -- about all of the limitations of these -- of
these parts so that the construction professional can use them
in a responsible and correct way; try to protect them from
experiencing corrosion and being put into other situations that
may cause them not to perform as well as they otherwise might.

     **THE COURT:**  All right.  If you would answer questions
1 and 2 under motion for class certification, I wanted to first
make sure that we addressed the concerns of Plaintiffs'
Counsel.

     **MR. HOWARD:**  So, with respect to number one, we do
believe that if the Court finds that Ms. Card, Ms. Tumelson are
subject to the statute of limitations defense, that that would
be dispositive of the class certification motion.  This does
bleed in a bit to the motion for judgment on the pleadings.

     With respect to the unfair prong of the UCL claim, we
believe that they -- that none of the Plaintiffs can assert the
unfair prong based on misrepresentations because they cannot
show reliance.

     And so, that only leaves as a predicate for or the basis

1  for the unfair competition -- sorry -- the unfair prong claim

2  the breach of warranty claim.  That would be the underlying

3  basis for the -- for the unfair -- the unfair prong claim.

4      And if that's the case, then if Ms. Tumelson and Ms. Card

5  are excluded because of the statute of limitations defense,

6  then there's no party that can bring the unfair prong claim;

7  and they are the only two class representatives that are being

8  put up; and that would be the case even if the Court decides,

9  Well, no, we are going to separate out the breach of warranty

10  from the -- from the unfair prong claim.

11      If Ms. Tumelson and Ms. Card are subject to the statute of

12  limitations defense, then there is simply no Plaintiff who is

13  left being put up as a class representative on the motion for

14  class certification on any claim.

15      **THE COURT:**  Well, they are saying that they stand in

16  the shoes of the previous buyer.

17      **MR. HOWARD:**  The what?

18      **THE COURT:**  The Plaintiff says that Ms. Tumelson

19  stands in the shoes of the previous buyer.  I may have that

20  wrong but that's what I got it down as he was arguing.

21      **MR. LIPPSMITH:**  That's correct.

22      **MR. HOWARD:**  But I believe Mr. Sullins was also

23  subject -- is also subject to the statute of limitations

24  defense based on -- based on when his home was built.

25      **THE COURT:**  Thank you.  All right.  Turning our

1   attention now to the Daubert motion, and then Counsel will be

2   able to give me their best argument on any other remaining

3   issues that they feel the Court should take into consideration

4   above and beyond your answers in your written responses.

5       All right.  Returning to the Daubert motion.  Good

6   afternoon, Counsel.

7           MR. THOMSON:  Good afternoon, Your Honor.  As to

8   number 1 -- do the parties believe that granting the Daubert

9   motion will be dispositive of the motion for class

10  certification -- the answer is yes.  We heavily rely on

11  Dr. Brown.

12          THE COURT:  I'm sorry?

13          MR. THOMSON:  We heavily rely on Dr. Brown.  We don't

14  think class certification will be granted without Dr. Brown's

15  testimony.

16          THE COURT:  All right.  There are some additional

17  questions.

18          MR. THOMSON:  Oh, I didn't know if you wanted me to go

19  or you wanted to go one at a time.

20          THE COURT:  I prefer you go through all of your

21  questions and then surrender the microphone to your opposing

22  colleague.

23          MR. THOMSON:  Thank you, Your Honor.  Okay.  The

24  second question regarding the methodology and the express terms

25  that were used by Dr. Brown of fail, prematurely corrode and

1    life of a home.  I think we need to start there with "life of a

2    home."  Life of a home is sort of an industry standard.  Life

3    of a home, service life of a home, service life, these are all

4    the same thing.  And *Hicks versus Kaufman Broad Home Corp*,

5    89 Cal.App.4th, 908 at 923, which we cited in our papers,

6    basically said the foundation's -- of a home's useful life --

7    is basically indefinite.

8        Okay.  As many contractors have told me over the years,

9    properties are intended now to last until somebody wants to

10   tear them down.

11       So, when we look at that, when he speaks to the life of

12   the home, Dr. Brown is basically saying until somebody decides

13   to tear that foundation down; and that's how long he

14   hypothesizes -- he opines -- that these Simpson products should

15   last.

16       So, when he says they should prematurely corrode -- once

17   again moving backwards through the question because that is

18   sort of the second part of it -- premature corrosion is when

19   those Simpson straps lose their design load capacity.  And when

20   they lose their design load capacity, they then fail.  And that

21   premature corrosion -- when he says "premature corrosion," it

22   goes back to the initial theories that Dr. Brown talks about in

23   his declaration at ECF 254-19.

24       It is basically most steel that's embedded in a foundation

25   is embedded in such a way where the concrete passively protects

1    the steel.  The experts for the Defendant agree with Dr. Brown

2    that that passive protection of steel exists because of the

3    high pH level of the concrete.

4        What happens here is these Simpson straps, these Simpson

5    products, are prematurely corroding because they are inserted

6    into those areas where that passive protection that's granted

7    by steel by its very nature of the concrete is lost through the

8    carbonation.  That's because of the inadequate concrete cover

9    and that diminishing to zero cover that occurs by the natural

10   way in geometry of how the straps are installed.

11       One of the reasons that --

12       **THE COURT:**  But would the installation of the straps

13   and the protective material or the timing of putting the straps

14   into the concrete, wouldn't that be the contractor's

15   responsibility?

16       **MR. THOMSON:**  No, because the straps have to be

17   installed at the time of construction and the geometry of the

18   installation of the straps has to be such that they exit the

19   edge of the foundation to go up the framing.  That's the only

20   way geometrically they can exit.  That's why Dr. Brown's

21   declaration expanded somewhat to give those visual queues,

22   which weren't in his last declaration, and give those figures

23   that show how the geometry -- the actual installation occurs

24   where it is always going to occur where it is going to lose

25   that concrete cover.

1     **THE COURT:**  I guess my question is:  If the Simpson

2  products provide four pages plus of instruction on how to

3  reduce the exposure or reduce the possibility of there being

4  corrosion, is that the product supplier's issue or is that the

5  construction company's issue?

6     **MR. THOMSON:**  I think that goes to the warranty issue

7  because the warranty doesn't have any of that language.  The

8  warranty also says, however --

9     **THE COURT:**  And I'm just wondering if Dr. Brown took

10  any of this into consideration is what I'm asking.

11     **MR. THOMSON:**  Okay.  I think he did.  I think he took

12  in the variables.  He took in the variables of construction.

13  He took in the variables of the environment.  He took in the

14  variables of the type of concrete.  He took into account all of

15  those variables and that's throughout his declaration.  And

16  even taking into those accounts those variables, his opinion is

17  these Simpson straps inherently failed because of the geometry

18  and the way they are told to install them.  Not only are

19  they -- the installation instructions followed and the inherent

20  defect occurs but physically, naturally that's the only way

21  they can be installed.

22     So, once again just to finish it out, the failure is when,

23  as was said earlier, when the straps lose their design load

24  capacity.  And if they lose their design load capacity during

25  any time of the service life of that home until it is virtually

1    torn down, under *Hicks*, then what you have is you have a

2    failure of the product.

3            **THE COURT:**  Okay.

4        **MR. THOMSON:**  Number four is Plaintiffs argue the

5    case -- law of the case doctrine.  I do find it somewhat

6    concerning that what we are seeing is a situation where

7    Dr. Brown expounded on his prior declaration.  He didn't add

8    anything new; but, you know, for example, he had -- he talked

9    about his prior experience in one paragraph.  He expanded that

10   to ten.  So, we went from 37 paragraphs to 87 paragraphs.

11   There is no real new information except for some diagrams to

12   try to explain that visual queue and how the straps were

13   installed and he included additional photos.

14       Otherwise, the carbonation, the depth of concrete cover,

15   the importance of that, the reliance on the ACI standards, the

16   reliance on the building code, the reliance on the use of life

17   of the product all are -- all are the same within the

18   declaration.

19       In both declarations he talks about the 45-degree

20   installation, the geometry that occurs.  He just expounded upon

21   it because there was some concern that it wasn't quite

22   understood by the prior judge.

23       He talks about the low G, galvanization.  He talks about

24   the interior dry environment.  He talks about the ambient

25   environments.  He talks about using the SCMs testing; his

1    observations of hundreds of failures of these straps.  He talks

2    about the location of the products.  He talks about that they

3    are hidden.  He talks about that they are told to be installed

4    in interior dry environment.  Yet, concrete is inherently

5    humid.

6         There is fundamentally -- the only two things I could

7    really identify that were new were he talked about a

8    phenolphthalein test, which he did start doing since the last

9    one -- last declaration, which is just -- proved what he had

10   said before; that that carbonation rich low porosity -- or high

11   porosity zone would allow moisture in to degrade the Simpson

12   products.  So, that phenolphthalein test is new.  But that just

13   proved what he had said before.

14        **THE COURT:**  So, would you agree that on remand it is

15   substantially different?

16        **MR. THOMSON:**  It is not substantially different.  I

17   think that's --

18        **THE COURT:**  Slightly different?  Moderately different?

19        **MR. THOMSON:**  I don't think --

20        **THE COURT:**  What would you give it?

21        **MR. THOMSON:**  I don't think it is fundamentally

22   different at all, Your Honor.  I don't think there is anything

23   new in the new declaration.  And that takes us towards

24   Rule 702.  Rule 702 was amended between the time that the

25   appellate ruling came down and today, but Rule 702 basically

just said the predominance standard and just put it into the
statute.  It has been case law since 1987.

In the case of *Bourjaily versus U.S.*, 483 U.S., 171 to
175, in 1987, it declared that the predominance standard was
the standard for admissibility under Daubert.

Now, interestingly enough the advisory committee, when
they amended Rule 702, said they are not changing the rule.
They are just needing to clarify it for the trial courts.

So, what the Defense now argues is that the statute that
was amended to help the trial courts that somehow the Ninth
Circuit appellate erred when the amended Rule 702 has always
been the same.

**THE COURT:**  Final question.

**MR. THOMSON:**  And the final question, that is what
they argue but at -- the Defense argues that Dr. Brown only saw
corrosion at five of the 17 products of the homes.  I think we
have to look at a couple of things.  One at ECF 154-19,
paragraph 84, Dr. Brown says each sample he looked at or looked
at a photograph of, he was able to identify red rust.

What we see in the Defense declarations are making light
of rust they see, and then discounting it.  So, they are
saying, well, there is substantial corrosion of a few.  There
is some corrosion of some or there is corrosion that we were
not concerned with as some others.  Dr. Brown in his
declaration said he saw corrosion in all the samples he viewed,

1   number one.

2          **THE COURT:**  I will not admit -- (inaudible).

3          **OFFICIAL COURT REPORTER:**  I'm sorry, Judge.  This is

4   the court reporter.  I cannot hear you.

5          **THE COURT:**  I will not admit that I have a book that

6   teaches me how to do it myself, but I have had exposure to some

7   metals, nails, different things that if exposed to any

8   moisture, red rust is going to appear; but that doesn't mean

9   that the nail loses its consistency.  So, when you indicated to

10  me that he saw red rust, my concern is:  Did he see the

11  presence of corrosion or is mere red rust enough to consider it

12  corrosion?

13         **MR. THOMSON:**  Okay.  I think that's when we look back

14  at Dr. Brown's declaration, and he says once corrosion starts,

15  it doesn't stop.  And because the corrosion is occurring to

16  metal that's in an area where it's lost that passive

17  protection, that concrete forged steel, that corrosion is going

18  to occur.

19         Also, it's set forth in that carbonated area where it's

20  going to be a humidity rich environment that is able to wick up

21  moisture from the soil through the concrete.  Since the

22  corrosion doesn't stop, any form of corrosion to that steel in

23  that passively protected zone is the beginning of the end.

24         And as the Court notes in the questions that they asked us

25  at 2, we don't have to wait for the manifestation of the

defect.  It is not a prerequisite to class certification.  Just like here, it is not a prerequisite to Dr. Brown finding that the Simpson straps are inherently defective.

**THE COURT:**  All right.  Thank you.  All right.  Counsel for the Defendant.

**MR. HOWARD:**  Okay.  Well, let me start with the -- let me go back and start with the predominance question because it ties into the Daubert question.

Our issue with Dr. Brown's opinion is that he has not used a reliable methodology by which you can determine and be able to judge whether or not it is a defect in the part that is causing corrosion to occur or if it is one of the other enumerable variables, that, in effect, how the part will perform such as the construction practices, the quality of the concrete, other qualities of the construction, the grade of the home, where the home is located, the amount of corrosive elements in the soil, so on and so forth.

Dr. Brown hasn't provided us a means by which you can -- that they can show and that you can reliably test as to whether or not there is a defect that's affecting these parts or if it's simply what happens at different individual homes based on the variables that are issue at those homes.

Dr. Brown only looked at information and evidence that supported his opinion, and he ignored all of the evidence to the contrary even when that evidence very clearly suggested to

him that he needed to do more or at least try to control for those variables.

Plaintiffs' Counsel said that he has taken into account the environment.  He took into account construction practices. He took into account, you know, all of these different variables.  He doesn't say that in his report or in his declaration.  He doesn't talk about any of those things.  If he does talk about them, he gives it the back of the hand.

He simply says in a conclusory manner that, oh, well these -- all these parts have the same defect.  They are all going to fail, and it doesn't matter where the parts are located, who built them, how they were built.  They are all going to fail, but we don't see -- we don't believe that he has shown how he can reliably determine that if he hasn't, for instance, taken into account that the ACI provides diagnostic guidelines for determining what -- you know, how you diagnose what causes -- what caused corrosion in a particular instance and then use that -- use those guidelines to do an analysis. He doesn't do that.

He doesn't -- he says that he looked at -- I don't know how many parts he looked at, but I don't think he looked at all of the parts because there were parts that had no corrosion on them; and he doesn't seem to have taken that into account at all.  And yet, his theory is that based on where -- because these parts were placed at the edge of the concrete, there is

always enough water.  There is always enough corrosive

elements, and there is always enough carbonation that you are

going to get corrosion.

So, within at least one single house you would expect,

based on what he has said, that all of the parts would have the

same amount of corrosion -- exhibiting the same amount of

corrosion and they don't.  We have -- the majority of the parts

in these houses had no corrosion.

Plaintiffs say that we try to sort of give the back of the

hand to small amounts of corrosion that were on some parts and

have mixed up our numbers.  They don't provide their own

number.  How many parts did he totally look at and what was the

nature of the corrosion that he saw and what was the nature of

the area in which he saw that corrosion?  Because what we saw

is that, well, in that same photograph where you will see one

of our parts that has corrosion on it, you will also see the

weep screed that has corrosion on it.  The weep screed is a

protective layer.  Water drips onto it.  And so, that water is

not coming up from the concrete that causes corrosion on the

weep screed.  The weep screed is not in the concrete.

Dr. Brown doesn't seem to have taken that into account.

Doesn't seem to have taken into account where there are things

like planters that are messed up.  Doesn't take into account

that at Ms. Allen's home, the parts were misinstalled.  They

are two inches lower than they were supposed to be and that

1    apparently the soils at her home have high levels of chloride.

2    None of these things come out in his declaration.

3        And so, we don't see a methodology whereby he's actually

4    taking things into account, the variables, that may be counter

5    to what his conclusion is and then at least tried to control

6    for them.  He doesn't even acknowledge them.  This is one of

7    the most evident things that he does is to ignore the second

8    sentence of section -- of one of the ACI provisions, Section

9    2.4.6.

10       He says there that, well, you know, all of the Simpson

11   parts had to be 3 inches in the concrete.  Our expert shows

12   that that calculation is incorrect.  But the second sentence of

13   that provision basically says that if you can't -- you know, if

14   a piece of embedded metal can't be put in at the same depth of

15   concrete as a piece of rebar -- reinforcement bar -- then extra

16   measures will be necessary to protect it.  He never discussed

17   that -- that sentence.  It is an exception to what he says is a

18   hard and fast rule that these parts have to be at least three

19   inches within the concrete or some amount of inches within the

20   concrete.

21       And there are -- there is a whole chapter, another

22   chapter, in ACI 222 that talks about the different ways that

23   you can protect embedded metal from corroding including using

24   things like corrosion inhibitors, vapor barriers, other types

25   of waterproofing.

1    So, we see large holes in what Dr. Brown has in his

2  analysis that makes the methodology by which they could -- if

3  they could show on a classwide basis the existence of the

4  defect impossible.  I can't tell from one part to the next that

5  it was the defect that supposedly caused this problem or the

6  fact that they misinstalled the part or the fact that they

7  didn't use enough concrete or the fact that the grade to the

8  home has water flowing onto the house when that grade was

9  designed to have the water flow away from the house.

10    That's what we mean when we say that they have not

11  presented evidence that they can show on a classwide basis that

12  there is a defect as opposed to all of the other variables that

13  could cause corrosion in these parts.

14    **THE COURT:**  On the one hand you share with me that the

15  doctor -- Dr. Brown did not really discuss these variables and

16  how they could impact the corrosion or corrosion resistance or

17  the presence of red rust, et cetera.

18    On -- conversely, you argue that under the law of the case

19  doctrine, the motion should -- the Daubert motion should be

20  barred because the Ninth Circuit previously held Dr. Brown's

21  then asserted opinions were admissible and reliable.

22    However, on remand things are substantially different.

23  Counsel for the Plaintiff conversely says not fundamentally

24  different, not slightly different, not moderately different and

25  definitely not substantially different.  Your position.

1          **MR. HOWARD:**  I think that his new opinions are

2     substantially different.  He has 50 new paragraphs with, you

3     know, new and additional analysis.  They are all in the same

4     vein.  I don't believe that he is, you know, going to radically

5     change what his opinions are, but I think that the -- all of

6     these new paragraphs and all of these new details, what they

7     actually show are more of the methodological holes in his

8     opinion and how he reaches his conclusion that the defect can

9     be shown on a classwide basis.

10         The Plaintiffs chose not to proceed before the Court with

11    Brown's older -- old opinion.  They wanted new briefing.  And

12    so, they had Dr. Brown do a new -- new declaration and give new

13    opinion.  That includes a new home.  You know, includes

14    Ms. Allen's home.  So, that is different.  He has now included

15    that as part of his analysis.  That's a substantial difference

16    in and of itself.

17         The fact that -- and to address the change to the evidence

18    code, that change is a significant change.  I think that

19    when -- when the judicial council decides they are going to

20    change the code and how it is written because they think that

21    trial courts need to be -- some assistance with their

22    interpretation, that is significant.

23         And the Court is obviously judging Dr. Brown's opinions

24    based on his ability to show that it is more likely than not he

25    has satisfied the elements of 702 and that has just been

1    clarified, but we are doing this with a new opinion; and he has

2    to do -- he has to make that showing with this new opinion.

3        If they wanted to proceed with the old opinion and -- to

4    take advantage of the Ninth Circuit's decision, well then, they

5    should have just had him resubmit his old opinion or they

6    should have just continued with the class certification motion

7    that we originally filed; but they chose not to do that.

8        So, we believe that this is entitled to a new look and in

9    light of the new rule or the new -- the new articulation of the

10   new rule.

11       **THE COURT:**  All right.  We have twenty minutes

12   remaining in this session which gives each of you ten minutes

13   to address the motion to dismiss and the motion on the judgment

14   of the pleadings.  And, please, we have read everything.  I

15   have read all of your pleadings as well as your responses to my

16   questions.  So, anything that you feel that the Court should

17   know that you either overlooked or you would like to emphasize

18   at this time starting with the Counsel for the Defendant.

19       **MR. HOWARD:**  Thank you, Your Honor.  I want to make

20   sure that I have gone through all of the questions.

21       I think it is important -- and we have emphasized this in

22   our briefing, I know -- but Plaintiffs have tried to explain

23   what Brown -- what Dr. Brown means and what they mean by fail,

24   premature corrode and life of a home.  None of what they have

25   said today is any of their briefing.  None of what they have

1    said is any of what Dr. Brown submitted to the Court.

2        And it's still inconsistent.  Does the part fail because

3    it exhibits red rust?  Is that a failure?  Or does it when it

4    loses its load capacity?  That's a very important consideration

5    in determining how to approach the claims in the case because

6    the Plaintiffs haven't alleged that any of the parts in their

7    homes have failed to be able to resist seismic and wind events

8    because they have lost their load capacity.  At best they have

9    said that these parts are exhibiting some corrosion, which is

10   something that Simpson warns in its materials can happen.

11       Counsel for Plaintiffs attempted to say, well, that's not

12   in the warranty.  Well, it is part of the literature and it is

13   part of the recommendation; and it is part of the guidelines

14   that Simpson provides, and those are incorporated into the

15   warranty as is the Simpson statement that it cannot predict the

16   service life of the products due to the many variables involved

17   in a home.

18       Simpson is being responsible in doing that.  It cannot --

19   it doesn't know all of the things that are happening in a

20   particular house, who buys the product, how they use it.

21       So, they can't predict whether or not that part is

22   actually going to be able to last for X number of years.  And

23   so, they don't try and they give that warning to the

24   construction professionals who purchase the products.

25       With respect to -- there was a question that the Court had

1  with respect to Brown's qualifications to opine on this

2  selection of installation of products and why we say that he is

3  not qualified.

4      The reason that he is not qualified to do that is because

5  being a materials scientist doesn't make him a structural

6  engineer or a concrete specialist or that he has any knowledge

7  of how homes actually get built and the decisions that are

8  made.  Those are two different skill sets.

9      A builder of a home may know lots about building a home

10  and using metal parts to build a home, but that builder may not

11  have the knowledge to be able to explain why in a particular

12  situation corrosion occurs.  Material scientists may be able to

13  do that.  But by the same token, a material scientist doesn't

14  have the perspective or the knowledge that a structural

15  engineer, who actually designs homes and is selecting parts,

16  based on a unique set of variables before that particular

17  construction professional to be able to opine that when a

18  construction professional looks at the Simpson materials that

19  they have a particular interpretation of it that requires that

20  Simpson say the words "concrete environment" even though this

21  person works with concrete all the time.

22      That's the presumption that they have tried to assert into

23  this matter because they are trying to use a reasonable person

24  standard who is a person who is not a professional, the people

25  who actually buy these products -- use these products and build

the homes that the products are used in.

I don't think that -- he simply has not shown that he has that skill set.  He has a skill set for certain types of analysis.  He doesn't say -- but he hasn't shown that he has a skill set for being able to interpret and to step into the shoes of a construction professional who is trying to build a house.

THE COURT:  You have five minutes remaining.

MR. HOWARD:  I think in general what we see in this case is that the Plaintiffs are attempting to hold Simpson to promises that it has never made.  And if they have run into -- run into difficulty in terms of being able to assert their claims, they simply ignore what the Court has said and what Simpson says in its literature.

Judge Hixson found long ago that Simpson does not -- does not suggest to anybody that the parts will never experience corrosion during their service life and that there is no lifetime warranty.

And yet, the Plaintiffs continue to ice the pail by saying, Oh, no, the parts can never experience corrosion because they experience a little corrosion.  Well, that's just the beginning of the end.  That's not -- that's not accurate.  Corrosion can be arrested.  You just simply have to remove the portions of water or corrosive elements that are causing it, and so you have to do that analysis.

1    But the Plaintiffs are trying in any way they can to

2    assert a claim that allows them to try to bring class; but

3    inherently, the use of these parts, how they get used and how

4    they perform, depends on the conditions at the individual homes

5    in which they are installed.  They are all installed by

6    different people.  They use different methods of installation

7    even though the parts may wind up in the same place.  They have

8    different levels of skill.  Some have more.  Some have less.

9    These parts are -- the ground that the homes are on have

10   different levels of different chemicals and different elements

11   in them that can affect how the part will perform and how the

12   house will perform.

13   And the Plaintiffs in their attempt to come after Simpson

14   may be ignoring issues at their house that are actually causing

15   corrosion of the parts in other issues with their home.  Almost

16   all of these Plaintiffs have brought claims against their

17   builders before coming after Simpson in this case because there

18   were construction defects at their home.  None of them have had

19   homes that were perfectly built.

20   So, the ideal situation that Dr. Brown talks about where

21   everything is done perfectly but the parts still corrode, that

22   doesn't exist.  We cannot ignore all of those variables that

23   can potentially cause corrosion and affect the performance of a

24   part although I will say that all the parts we have seen, they

25   are all performing.  None of them have lost their load value.

1    There is no breach of the warranty.  The warranty is not

2    as broad as the Plaintiffs would like it to be, either in its

3    terms or the duration that they are asserting.

4         **THE COURT:**  Thank you.  Counsel, you may proceed.

5         **MR. LIPPSMITH:**  Just for clarification, you want us to

6    address the motion for judgment on the pleadings in this

7    section; right?

8         **THE COURT:**  Yes.  Counsel completed his thoughts on

9    the Daubert motion and then made concluding remarks and his

10   time is now complete.  So, you may proceed.

11        **MR. LIPPSMITH:**  Thank you.  I just wanted to make sure

12   I was on the right page here.

13        So, first, I do have to say something to come back at what

14   Mr. Howard just said.  He said that Judge Hixson made a finding

15   that there is no lifetime warranty.  That is not accurate.

16   There has been no such finding in this case ever at all, and I

17   think that's an issue that could be decided on a classwide

18   basis and is probably a good reason to certify the class.  So,

19   we can tee that up.  So, we can also tee up the issue about

20   what their corrosion warnings mean or don't mean, what the

21   warranty means or doesn't mean.

22        In the class certification and in the pleadings, it is the

23   same warranty for everybody.  It is the same corrosion warnings

24   for everybody.  It is the same theory of what the expectation

25   of what the life of a home is for everybody.  These are the big

1    concepts that Mr. Howard keeps discussing and trying to contest

2    and they are not decided, and I think they can be decided on a

3    classwide basis.

4        Turning to the motion for judgment on the pleadings, I do

5    want to emphasize that the only party that's really going into

6    the product materials and representations in the product are

7    trying to turn this into a case about misrepresentations is

8    Simpson.

9        We have heard Judge Hixson's ruling where he said that

10   this is not a claim about misrepresentations.  We don't have a

11   claim about misrepresentations.  The claim here is for breach

12   of warranty, and the other claim here is for the UCL unfair

13   prong, which is not grounded in a misrepresentation claim.

14       We do reference the representations that are made to

15   contractors because that's important to rebut the Defense's

16   argument that somehow these corrosion disclaimers and

17   information they provide the contractors insulates them from

18   liability to the homeowner, but Judge Hixson, he has already

19   decided, there is no direct interaction between the homeowners

20   and Simpson; and, therefore, there can't be a claim grounded in

21   misrepresentation.

22       So, we actually have not been raising those at all except

23   to rebut their argument that somehow their corrosion warnings

24   to the contractors insulate them.

25       We have already addressed the lifetime warranty issue.  I

1  think we have adequately pled that it is a lifetime warranty.

2  I do think that's an issue that can be decided classwide and

3  probably should be because that could give some finality one

4  way or another on the issue.  I don't think it really matters

5  whether it is Card or Sullins or any of the other class members

6  out there.  The warranty is what it is.  There is not a change

7  in the warranty over the period alleged.

8      When we look at the -- whether it is a future performance

9  warranty -- again, that is another issue that we briefed up --

10  the difference between what we have here with Simpson and what

11  they have cited with other Defendants is that the other cases

12  that they had cited, the reliance was on marketing materials to

13  try to find the warranty.

14      Here, we are relying on the warranty.  The warranty is for

15  something in the future.  It says the homes will perform as

16  specified.  That is in the future.  That is not at the point

17  that they are built or at the point that the product was

18  bought, and they are warranting that the homes are going to

19  withstand earthquakes, windstorms, hurricanes.

20      And earthquakes do apply here in California, so this is a

21  product that has warranted against hazards here in California.

22  And more importantly, the issue about the specifications is

23  essentially so that homes can achieve building code compliance.

24  So, even if you don't have a windstorm or you don't have an

25  earthquake, there is still an issue there with the product

1    specification making the home not be able to perform to the

2    code that they are supposed to meet.

3        On the UCL, our UCL claim is a separate claim in this

4    case.  They keep trying to ground it into the warranty or

5    ground it into a misrepresentation, but it is not.  This is

6    unfairness prong case.  It has a separate way of evaluating it,

7    and that's gone into a decent degree in the *Cappello* case that

8    the Court had cited in its questions for us.  And in that, what

9    we have to prove is that an unfair business practice occurs

10   when it offends an established public policy or when a practice

11   is immoral, unethical, oppressive, unscrupulous or

12   substantially injurious to consumers.  That's a separate claim

13   from breach of warranty.  Separate statute of limitations also

14   measured by the date of discovery.  And I will remind the Court

15   again that they didn't move for -- did not move on the statute

16   of limitation under the UCL claim.

17       It is not a purely derivative claim as they would make it

18   sound.  There is a separate problem here when you have a

19   company that is manufacturing a defective product, knows it

20   is -- and we have a lot of evidence that we have built up

21   showing about how they talked about trying to change the

22   product and make it new and team No Spall -- this is all in our

23   papers on the class cert motion in particular -- and that they

24   continue to sell the product knowing that it's defective.  That

25   in and of itself satisfies what we need to prove for an

1  unfairness prong claim independent of whatever happens on the

2  warranty claim.

3       So, these are two different things.  That's actually where

4  we got tangled up with Judge Hixson in his prior ruling on

5  class certification, he kind of ignored this whole separate

6  claim under the unfairness prong.  We briefed it up.  Obviously

7  the Ninth Circuit didn't make its determination on that.  It

8  focused on Paul Brown's opinions, but that was a prior issue

9  that didn't really get teased out as accurately as I think it

10  should have been.

11       Just in sum, I would say that -- take a quick step back.

12  The other issue too under the UCL standing, they do raise a

13  bunch of issues about UCL standing.  We did allege that people

14  are deprived of benefit of the bargain; that they also have

15  injury to their property because the products are corroding in

16  their foundations; and that there is diminution of value of the

17  home because of the presence of the defect in their homes going

18  forward.

19       So, those all satisfy UCL standing requirements; and I

20  don't think that we have to allege much more than that at this

21  point in time.

22       The last issue is whether leave to amend could be granted

23  or should be granted.  Obviously if the Court is inclined to

24  grant a motion to dismiss for any of the reasons and we can

25  find a way to amend, I think it's appropriate to allow us to

1  amend.

2      The Defense argues that it is too long -- the case has

3  been pending too long and we shouldn't be able to do that; but

4  the reality is we are up in the Ninth Circuit for probably

5  about two years in this case.  So, the age of it is a little

6  bit different than its filing date in terms of it being active

7  here in the trial court.

8      Plus, to the extent these are arguments that they could

9  have raised in an earlier motion to dismiss and they did not

10  and they kind of laid in the weeds and waited until after the

11  amendment deadline had passed, I think that that's a bit

12  unfair; and I do think that the Court should exercise the

13  requirements to allow amendment with great liberality to

14  conform with where we are right now in this case.

15      **THE COURT:**  Let me ask this case:  If the appeal was

16  taken up after pleadings had been settled and the focus was on

17  the Daubert motion, why would the Court re-open the date to

18  amend pleadings at this stage when the reversal or the remand

19  was based on the stage in which the case was at at the time?

20      **MR. LIPPSMITH:**  I think it is just more about a

21  fairness issue.  If these are issues that are dispositive on

22  the case -- and we have evidence and proof and we have provided

23  it to the Court in terms of the class cert paperwork -- we have

24  voluminous evidence we put in front of the Court on those

25  issues -- if we can amend because we have facts that will

 1  satisfy those requirements -- and I think we do.  They just

 2  might not have the same kind of detail that we could add --

 3  then I think it's just a matter of fairness and following the

 4  rule that courts are to allow parties to amend the pleadings.

 5           THE COURT:  All right.  Thank you.

 6           MR. LIPPSMITH:  Thank you.

 7           THE COURT:  Thank you.

 8           MR. HOWARD:  Thank you, Your Honor.

 9           THE CLERK:  Thank you all.  That concludes this matter

10  and court is now adjourned.

11                (Proceedings adjourned at 4:26 p.m.)

12                         ---oOo---

1

2

3    **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    January 17, 2025

8

9

10

11    _Marla Knox_

12        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
         United States District Court - Official Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25